Hines, J.
Introduction
These consolidated cases were brought in response to a default judgment for $2.1 million entered on February 22, 1996 in the Plymouth Superior Court against Freedom Tercentennial Trust d/b/a/ Bert’s Restaurant (“Trust”)[1] in a suit (“Silva action”) brought by Eleanor Silva, administratrix of the estate of John Silva (“Estate”). In Civil Action No. 96-3127, the Liquor Liability Joint Underwriting Association of Massachusetts (“LLJUA”) brought an action seeking a declaratory judgment that it is not obligated to pay the default judgment entered against the Trust, its insured. In Civil Action No. 96-4675, the Estate brings a reach and apply action[2] to establish LLJUA’s obligation to provide coverage up to its policy limit on the default judgment. The Estate also brought an unfair settlement claim pursuant to G.L.c. 176D and G.L.c. 93A. The parties filed cross motions for summary judgment as to their respective claims. On June 25, 1999, the court (Quinlan, J.) ruled as follows: 1) granted summary judgment to the Estate on its reach and apply claim against LLJUA; 2) granted summary judgment to LLJUA on the Estate’s G.L.c. 93A claim; and 3) denied summary judgment to LLJUA on its declaratory judgment action. On February 28, 2001, the court vacated its order granting summary judgment to LLJUA on the Estate’s G.L.c. 93A claim, relying on the Memorandum of Decision and Order on Parties’ Cross Motions For Summary Judgment in Bolden v. Liquor Liability Joint Underwriting Association of Massachusetts, Worcester Superior Court, Civil No. 98-0999B (June 15, 2000) (Hillman, J.).
The proceedings before me are the assessment of damages on the Estate’s reach and apply claim and the trial of the Estate’s G.L.c. 93A claim against LLJUA. The issues were tried over nine days in January 2002. On May 31, 2002, the parties completed their post-trial submissions which include hundreds of pages of exhibits, various memoranda and voluminous requests for findings and rulings. On the basis of the credible evidence and the reasonable inferences I draw therefrom, I find and rule as follows under Mass.R.Civ.P. 52(a).
FINDINGS OF FACT
In the early morning hours of September 12, 1987 in Plymouth, Massachusetts, John Silva, a young attorney who practiced law in New Bedford, was killed when a car driven by John J. McGowan, III collided with Silva’s vehicle. McGowan, who was intoxicated at the time of the accident and had last been served alcohol at Bert’s Restaurant in Plymouth, also died as a result of the collision. John Angelo, who was riding in Silva’s car, and Steven M. LaGarde, who was riding in McGowan’s car, were both seriously injured but survived the accident.
On December 5, 1989, the Estate filed the Silva action in Plymouth County Superior Court, Civil Action No. 89-2469B against Bert’s Inc., for damages caused by the automobile accident. The Estate filed an amended complaint on or about January 16, 1990, adding as defendants R/F Enterprises, Inc. d/b/a Bert’s Oceanside (“R/F Enterprises”), Daniel Richman (“Richman”) and Eugene Fortun (“Fortun”), the alleged owners of “Bert’s Oceanside Restaurant.” Richman owned 78% of R/F Enterprises. Fortun owned the remaining 22% of R/F Enterprises. The complaint alleged that the defendants, by their agents, servants or employees, negligently, wrongfully and unlawfully served alcohol to McGowan while he was intoxicated, and that McGowan’s intoxication caused him to collide with Silva’s car.
During the pendency of this action, all of the named defendants filed for bankruptcy or ceased to exist. On or about February 20, 1990, R/F Enterprises filed for bankruptcy. The Silva action against it was stayed on or about March 29, 1991. Bert’s Restaurant closed for business at about the same time that R/F Enterprises *270 filed for bankruptcy. Richman filed for bankruptcy in June 1991 and was discharged on December 3, 1991. Fortun filed for bankruptcy on October 17, 1991 and was discharged on March 20, 1992. As a result of their discharges in bankruptcy, Fortun and Richman were dismissed from the Silva action with prejudice on December 5,1995 and January 26,1996, respectively.
In 1993, almost four years after the Silva action was filed, Peter Smola (“Smola’j, the attorney representing the Estate learned through documents produced in the course of the litigation that the LLJUA had issued a liquor liability policy to the Trust. Both Richman and Fortun were trustees of the Trust. On August 27, 1993, the Estate served on Richman, Fortun and R/F Enterprises a motion for leave to amend its complaint in the Silva action to add the Trust as a defendant. The motion was filed on September 20, 1993. The court allowed the motion on October 28, 1993. No amended complaint naming the Trust was ever filed or served.
The Silva action languished in the Plymouth Superior Court until February 1, 1995 when the court defaulted the Trust for failure to appear at a January 4, 1995 status conference. On February 2, 1996, the court (DelVecchio, J.) held a hearing and assessed damages against the Trust. Both Richman and Fortun were notified of the hearing. Only Richman appeared at the hearing. On February 22, 1996, judgment entered against the Trust and R/F Enterprises in the amount of $2,112, 081 with interest and costs.
With the judgment in hand, the Estate’s present counsel sent LLJUAletters on April 22, 1996 and April 29, 1996 demanding payment of the Trust’s policy limit toward the judgment. LLJUA did not respond. Instead on June 7, 1996, LLJUA filed its declaratory judgment action. Thereafter on June 17, 1996, the Estate filed its reach and apply action. With the two actions pending, LLJUA on August 21, 1996 filed motions to intervene and to set aside the judgment in the Silva action. On December 19, 1996, the court (Connon, J.) summarily denied LLJUA’s motions. LLJUA filed an appeal which was denied in the Appeals Court on July 27, 2000.
The LLJUA Policy
The liquor license for Bert’s Restaurant was held by the Trust and the Trust owned the property on which Bert’s Restaurant was located. The trustees of the Trust were Richman and Fortun. As majority owner of Bert’s Restaurant, Richman took responsibility for decisions concerning the Trust, including the purchase of insurance. In December 1986, the Trust applied for a liquor liability policy from the LLJUA. The Trust submitted its application through Almeida & Carlson Insurance Agency (“Almeida & Carlson”), a licensed insurance broker. At the time that the Trust applied for LLJUA insurance, Bert’s Restaurant had no other insurance policy in effect for liquor liability.
The LLJUA issued policy number 071926 (the “Policy”) to the Trust. The named insured on the Policy was Freedom Tercentennial Trust d/b/a Bert’s Restaurant. R/F Enterprises was not named as an insured on the policy itself. However, the names Bert’s, Inc., R/F Enterprises, Inc., Freedom Tercentennial Trust, Restaurant Realty Trust, Richman/Fortun Associates, Inc., Bert’s Restaurant, and Bert’s Oceanside all interchangeably represented Bert’s, an entity owned and operated by Richman and Fortun. The names were interchangeably used in LLJUA’s records as in LLJUA’s 60-day report which refers to the “insured” as “Bert’s Incorporated d/b/a Bert’s Oceanside.” Additionally, a letter written by an LLJUA claims representative refers to “Our insured: Bert’s, Inc.”
The policy provided for $500,000 in coverage, with additional coverage for postjudgment interest in suits defended by LLJUA. The LLJUA policy had an effective period of December 12, 1986 through December 12, 1987. The LLJUA policy provided:
We will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as “damages” because of “bodily injury” to any person, caused by an “occurrence,” if such liability is imposed upon the Insured by reason of the negligence of the Insured in the distribution, sale or serving of any alcoholic beverage at the Insured premises. We shall have the right and duty to defend any suit against the Insured seeking such “damages,” even if the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as we deem expedient.
The Policy defines “insured” to include the members and partners of a partnership; the officers, directors, and shareholders of an organization; and employees and agents. LLJUA’s insureds included Richman and Fortun, as well as the Trust.
The Policy requires, as a condition of coverage, that the named insured notify the LLJUA promptly as soon as it becomes aware of any injury that might result in a claim against the insured, and to provide the LLJUA with how, when and where the injury occurred and the names of any injured persons and witnesses. The LLJUA similarly requires, as a condition of coverage, that the named insured give the LLJUA “prompt written notice” in the event a claim is made or “suit” is brought against any insured. The term “suit” was defined, in pertinent part, as “any lawsuit in which money damages are sought because of ‘bodily injury’ to which this insurance applies.”
The Policy further requires that in the event of a claim or suit, the named insured and any other involved insured must “immediately send [the LLJUA] copies of any demands, notices, summonses or legal papers received in connection with the claim or suit.”
The Great American General Liability and Umbrella Policies
In July 1987, Bert’s purchased a general liability policy and an umbrella policy from Great American *271 Insurance Companies (“Great American”), effective from July 1, 1987 through June 30, 1988. Bert’s purchased these policies after it had purchased the LLJUA policy. The Great American general liability policy did not cover liquor liability. The umbrella policy provides: ‘The insurance provided by this policy shall be excess insurance over any other valid and collectible insurance available to the insured ...” The LLJUA policy, on the other hand, provides: “This insurance is primary. Our obligations are not affected unless any other available insurance is also primary.”
Bert’s “Cancellation” of the LLJUA Policy
Shortly after securing the Policy through Almeida & Carlson in December 1986, Bert’s stopped paying the premiums. LLJUA’s servicing carrier, Eastern Casualty (“Eastern”) continued to send bills. On August 31, 1987, Eastern sent Bert’s a notice stating that the policy would be cancelled effective September 13, 1987 due to Bert’s failure to pay premiums. On September 1 and on September 24, 1987, Almeida & Carlson notified Bert’s of the cancellation date. Bert’s did not respond in any way to these notices.
On October 6, 1987, Eastern sent Bert’s a second notice stating that the LLJUA was cancelling the policy effective October 19, 1987, again for failure to pay premiums. LLJUA’s records reflect that the policy was actually cancelled for nonpayment on October 19, 1987, a little more than a month after the Silva accident on September 12, 1987.
On April 25, 1988, Eastern, acting as the servicing carrier, sent an invoice to Bert’s for $17,500 in unpaid premiums. This was followed by letters on May 27, 1988 and June 8, 1988 threatening to turn the account over to a collection agency. The June 8 letter cites Bert’s “continued silence” concerning the policy. On June 15, 1988, an Eastern representative called Bert’s bookkeeper and stated that the account would be turned over to a collection agency the next day. On June 16, 1988, the Eastern representative spoke to Richman, who stated that LLJUA should have “assumed” that he wanted to cancel the policy because he had stopped paying the premiums. Concerned that the account would be turned over to collection, Rich-man had a conversation with Debra Harvey, an Eastern representative, on June 17, 1988. During this conversation, Richman stated for the first time that he had telephoned Commerce, LLJUA’s previous servicing carrier, in January 1987 to cancel the policy. Richman could not identify the Commerce employee he allegedly spoke to in January 1987. The Eastern log entry on June 17,1988 is the first written reference to the alleged telephone call. I do not credit Richman’s assertion that he ever attempted to cancel the policy in January 1987 prior to the Silva accident.
Even if Richman’s claim to have made the call in January 1987 is credible, the call alone is not proof of an agreement by Commerce to cancel the policy. Rich-man offered nothing more than an “understanding” that the Policy had been cancelled as of February 1987. Also, even assuming that the call was made, Commerce had no authority to vary the terms of the LLJUA policy with regard to written notices of cancellation. LLJUA’s policy provides: “The first Insured designated in the Declarations may cancel this Policy by mailing or delivering to us written notice of cancellation, in advance of the requested date of cancellation.” (Emphasis added.) The LLJUA had a strict policy against allowing cancellations based on oral requests. LLJUA required that all requests for cancellation be put in writing so as to document the insured’s desire for cancellation and to avoid fraudulent conduct by the insured.
During the June 17, 1988 conversation, Harvey stated that she would act on Richman’s request to retroactively cancel the policy back to February 28, 1987 if Richman would place his request in writing. This requirement was consistent with the aforementioned terms of the LLJUA policy, as well as with Harvey’s understanding that the LLJUA required all requests for cancellation be put in writing. On August 18, 1988, Harvey wrote to Richman stating that if Richman did not send the requested letter, the unpaid balance of $17,500 would be turned over to a collection agency. In her letter, Harvey stated: “Your policy continued to remain in force until October [1987].”
Because Harvey could not disprove Richman’s assertion of a phone call, she agreed to adjust the amount of premiums due. In doing so, she was acting merely to resolve a premium dispute. She was not in any sense implementing a previously agreed cancellation. This finding is buttressed by the fact that Eastern never issued a cancellation endorsement, but rather it issued a “premium audit adjustment invoice” to Bert’s. On August 20, 1988, Richman sent the letter to Eastern requesting that the LLJUA cancel the policy effective February 1987.
On August 31, 1988, Almeida & Carlson received its first notice of the retroactive cancellation request. In a log entry, the agent noted that “normally, JUA would dispute this” and that Richman “never called us with request.” On September 12, 1988, a full year after the Silva accident and over 18 months after his alleged telephone call, Richman signed a policy release form. The release stated that: “No claims of any type will be made against the Insurance Company under this policy for losses which occur after the date of cancellation shown above [February 28,1987]. Eastern then issued a “premium audit adjustment invoice," resulting in a refund of $1,695 to Bert’s, but again it never issued a cancellation endorsement. Before Richman signed this policy release form on September 12, 1988, Bert’s had coverage in place through October 19, 1987, well after the Silva accident.
The retroactive cancellation did not comport with the Policy or established LLJUA practice requiring a written cancellation request. Before Richman’s con *272 versation with Harvey in June 1988, he never put a request for cancellation in writing. Harvey, as Eastern’s representative, is not aware of any other retroactive cancellation by the LLJUA. Other than the Richman cancellation, there is no record of any other retroactive cancellation by LLJUA based on the insured’s claim of an oral request for cancellation.
Great American’s Defense of the Silva Action
In January 1990, after being served with the Silva action, Richman notified Almeida & Carlson. The agency notified Great American but not LLJUA because it was aware that the LLJUA had purported to retroactively cancel the policy. In early 1990, Great American assumed the defense of Bert’s under a reservation of rights. Great American retained a law firm to pursue this defense. However, in December 1990, Great American disclaimed coverage and withdrew its defense. In November 1991, the Court allowed the firm to withdraw its appearance for Great American. In June 1996, the Estate brought a reach and apply action against Great American. The Estate and Great American settled this suit for $750,000 in September 1997.
The Demise of Bert’s Restaurant and Related Bankruptcies
On Februaiy 20, 1990, while the Silva action was pending, R/F Enterprises, one of the entities that had been named as a defendant in the Silva action, filed for bankruptcy. As a result, the Silva action against R/F Enterprises was stayed on March 29, 1991. Bert’s Restaurant closed for business at about the same time that R/F Enterprises filed for bankruptcy. In October 1991, Bert’s Restaurant was damaged in the so-called “No Name” storm, and all of the records from the operations of Bert’s Restaurant, except for those doc[1] uments that Richman had at his home, were lost as a result. Richman filed for bankruptcy in June 1991, and he was discharged on December 3, 1991. Fortun filed for bankruptcy on October 17, 1991, and he was discharged on March 20, 1992. As a result of their discharges in bankruptcy, Richman and Fortun were dismissed from the Silva action with prejudice on December 5, 1995.
The Estate’s 1993 Motion to Amend to Add the Trust as a Defendant
In August of 1993, the attorney representing the Estate, Peter Smola (“Smola”), learned through documents produced in the course of the litigation that the LLJUA had issued a liquor liability policy to the Trust. On August 27, 1993, the Estate served R/F Enterprises and Richman and Fortun in their individual capacities with a motion to amend the complaint to add the Trust as a defendant.
Although the Estate served this motion to amend the complaint on R/F Enterprises and on Richman and Fortun in their individual capacities, the Estate never served its motion on the Trust. Nor did it serve Richman and Fortun in their capacity as trustees. On September 20, 1993, the Estate filed its motion to amend the complaint, and on October 28, 1993, the Court allowed the Estate’s motion to amend its complaint to add the Trust as a defendant. Smola never filed an amended complaint naming either the Trust or Richman and Fortun in their capacity as trustees.
However, it is evident that Richman and Fortun knew that the Estate was pursuing a judgment against the Trust. Richman and Fortune were notified of all proceedings concerning the tort suit against the Trust. Indeed, at his deposition, Richman produced a file of documents that he had received concerning the tort suit, including the notice for the assessment of damages hearing, the assessment of damages, and the judgment. Regardless of the capacity in which Rich-man and Fortun received the Court’s allowance of the Estate’s motion to amend, it is clear that they had knowledge of the motion.
The Estate’s September 1993 Demand for LLJUA Coverage
On September 7, 1993, Smola sent a letter to the LLJUA notifying it of the Silva action, and requesting that the LLJUA provide coverage. Smola’s letter stated that the cancellation of the LLJUA policy was “highly improbable and quite improper,” and that it was the Estate’s position that the LLJUA policy was in effect at the time of the Silva accident. The letter made clear that the suit was against “Bert’s” and its principals. The Estate provided the LLJUA with a copy of the complaint on September 30, 1993.
Smola’s Effort to Take Discovery on the Cancellation of the Policy
On January 28, 1994, Smola noticed the deposition of the LLJUA’s Keeper of Records, in order to facilitate the Estate’s investigation of the facts relating to the cancellation of the LLJUA policy. On February 14, 1994, Cassandra Warshowsky (“Warshowsky”), LLJUA’s attorney, wrote to the Estate stating that the LLJUA would not attend the deposition because the Estate had not obtained a judgment against Bert’s. Warshowsky wrote:
You have represented to me that you have not obtained on plaintiffs behalf a judgment against Bert’s, Inc. or the other defendants in this suit. Neither has plaintiff entered into settlement with the defendants. Any claim against the LLJUA is thus premature and barred by statute ... A valid judgment against the insured is a jurisdictional prerequisite to any claim against the LLJUA by plaintiff for payment.
In light of LLJUA’s objection, Smola did not pursue the deposition of LLJUA’s keeper of records. He did, however, continue to pursue the judgment against Bert’s that Warshowsky told him he needed in order to make a claim on the LLJUA policy.
*273 The LLJUA’s Initial Investigation
In response to Smola’s September 7, 1993 letter, Charles Bucke, the Executive Director of LLJUA, located and reviewed the underwriting file for the policy issued to the Trust. The underwriting file contained a copy of the declaration page, handwritten notes from Debra Harvey reflecting her conversations with Rich-man, the bills, notices and correspondence dating from 1987 and 1988, the release by the Trust of the LLJUA for any liability for claims arising after February 28, 1987, the December 1987 audit and the premium audit adjustment invoice and calculation sheet reflecting the February 28, 1987 cancellation.
In spite of the LLJUA’s strict policy against allowing cancellations based on oral requests, Bucke came to the initial conclusion, based solely on the documents in the underwriting file, that the policy had been properly cancelled effective February 28, 1987. After he reviewed the underwriting file and formed this initial conclusion, Bucke called the LLJUA’s legal counsel and told him that he believed that the LLJUA policy had been cancelled before the Silva accident. On September 23, 1993, Bucke sent a letter to Smola in which he stated that the LLJUA would seek a coverage opinion from its legal counsel.
Bucke opened a claim file for the Estate’s claim arising from the Silva accident. Bucke asked David Lunny (“Lunny”), a senior claims representative at the LLJUA, to investigate the facts concerning the cancellation of the Trust’s policy and the Estate’s claim against the Trust. Bucke also asked Lunny to send a copy of Smola’s letter and the LLJUA’s underwriting file to counsel, and to ask counsel for an opinion on whether the Estate’s claim was covered under the LLJUA policy. Lunny sent the file to counsel on October 4, 1993 and began his investigation as requested by Bucke.
Lunny questioned the proprieiy of the retroactive cancellation from the start. When he sent the file to counsel, his cover letter stated: “Please note the underwriting records indicate that the policy in question was cancelled effective 2-28-87, however, you will note the cancellation date on the declaration page for policy period of 12-12-86 to 12-12-87 indicated the policy in question was cancelled on 10-19-87.” His contemporaneous notes of his investigation are replete with instances in which he questions whether the policy was effectively cancelled prior to the Silva accident. On December 27, 1993, Lunny states: “Insd. claims he had no coverage, but the policy termination date appears ?? to be 10/19/87.” Realizing the importance of this information, Lunny called counsel to “reveal” this information. In the following days, Lunny made several additional notations in the file about his conversation with Richman. He noted that Richman “claims” to have requested cancellation in February 1987 and that Richman wanted to avoid having to pay premiums. On May 2, 1994, Lunny states: “We probably will be stuck w/ coverage.”
As part of his investigation into the merits of the underlying tort claim, Lunny asked Richman for records from Bert’s Restaurant the day of the Silva accident. Richman told Lunny that all of these records had been destroyed as a result of water damage from the 1991 “No Name” storm. It was the LLJUA’s custom and practice when investigating the merits of a liquor liability claim against one of its insureds to focus its investigation within the “four walls” of the insured’s premises. However, even though the LLJUA knew that Great American had tendered a defense of Bert’s in the Silva action for approximately one year prior to the “No Name” storm, no credible evidence was presented to me that either Lunny or anyone else at the LLJUA contacted Great American or its attorney as part of its initial investigation into the merits of the Silva claim.
LLJUA knew that the retroactive cancellation of the Silva policy was potentially problematic. Bucke was aware of the concerns raised in Lunny’s notes. Likewise, Bucke knew that the Policy required written notice of cancellation and that LLJUA had a strict policy against allowing cancellations based on oral requests and he knew full well the reason behind that policy. Bucke also was familiar with G.L.c. 175, §112 which prohibited retroactive cancellations.[3] In sum, I find that the LLJUA largely ignored the missing factual and legal predicates for their position on the issue of coverage. Bucke simply made an “off the cufF determination that no coverage existed in September 1993 and pressed for a coverage opinion that supported his view of the merits of the claim.
Palmer & Dodge’s Investigation and Coverage Opinion
On October 4, 1993, Lunny contacted Palmer & Dodge (“P&D”) the law firm that has represented the LLJUA in insurance matters since the Legislature created the LLJUA in 1985. The Division of Insurance (the “Division”) recommended to the LLJUA that it retain Palmer & Dodge (“P&D”) to represent the LLJUA. The Division’s recommendation was based, in part, on the fact that P&D represented other entities, including the Medical Malpractice Joint Underwriting Association and the Massachusetts Property Insurance Underwriting Association, that had been created by the Legislature to provide insurance in areas where the commercial marketplace had dried up. As instructed by Bucke, Lunny requested a coverage opinion.
In October 1993, Steven Schreckinger (“Schreckin-ger”) was the partner at P&D who was primarily responsible for representing the LLJUA. Schreckinger had served as general counsel to the LLJUA since it was formed in 1985. In his role of general counsel, Schreckinger regularly attended meetings of the LLJUA’s Board of Directors and its Claim Committee. As of October 1993, Schreckinger had substantial *274 experience in matters relating to insurance. Schreckinger’s practice includes advising both insurers and insured on coverage questions. Schreckinger has represented several major insurance companies on coverage and regulatory matters.
Schreckinger asked Warshowsky to assist him in preparing the coverage opinion. Warshowsky had been at P&D since 1986 and was counsel to the firm. Warshowsky also had a substantial amount of experience in matters relating to insurance and had worked closely with Schreckinger on a number of coverage disputes. Schreckinger provided Warshowsky with copies of Smola’s letter and the LLJUA’s underwriting and claim files which included Lunny’s notes. Warshowsky reported to Schreckinger on a regular basis in regard to the coverage opinion.
On May 11, 1994, Warshowsky sent the coverage opinion to the LLJUA. Warshowsky advised the LLJUA that P&D did not believe there was any coverage for the Estate’s claim. Schreckinger had reviewed Warshowsky’s coverage opinion before she sent it to the LLJUA, and he agreed with Warshowsky that there was no coverage. Warshowsky based this coverage opinion on her review of the documents provided by the Estate’s counsel and the documents contained in the LLJUA’s underwriting file.
Warshowsky advised the LLJUA that there was no coverage for the Silva action under the policy issued to the Trust by the LLJUA for two reasons: (1) the policy had been cancelled on February 28, 1987, several months before the accident that gave rise to the Silva action, at the request of the LLJUA’s insured; and (2) the LLJUA was prejudiced because it had not received notice of the Silva action until 6 years after the accident and nearly 4 years after the Estate had filed suit, and after a default had been obtained against the LLJUA’s insured, and the LLJUA thus could assert late notice as a defense to any claim for coverage. Warshowsky reviewed the facts surrounding the cancellation and concluded that Harvey’s decision to recognize the cancellation retroactive to February 1987, despite the absence of any writing documenting the Trust’s request to cancel the policy, was reasonable in light of the change in servicing carrier at that time, the resulting “confusion” and the inability of Eastern to show that Richman had not called. In reaching its conclusion that there was no coverage, P&D did not explain how the retroactive cancellation to February 1987 could be reconciled with established LLJUA procedures, the Policy and G.L.c. 175, §112 which prohibits the cancellation of a policy of insurance after the insured has become responsible for the loss which in this case was September 12, 1987.
Smola’s Response to the Disclaimer of Coverage
On May 13, 1994, in language that substantially mirrored the coverage opinion she had provided to the LLJUA, Warshowsky sent a letter to Smola in which she stated that there was no coverage under the LLJUA policy. In that letter, Warshowsky faults Great American for withdrawing its defense without filing a declaratory judgment suit, although the LLJUA itself had opted not to file such a suit. On May 17, 1994, Warshowsky had a telephone conversation with Smola regarding her May 13, 1994 letter. In the discussion, Smola stated that he was not an expert on insurance issues while maintaining the vitality of the Estate’s claims. Smola’s modesty, painting himself as lacking expertise in insurance matters, set the tone for the LLJUA’s future dealings with him as it sought to fight off the Estate’s claim. Thereafter, LLJUA did not take Smola or the Estate’s claim seriously. LLJUA deliberately pursued a strategy that shifted the focus to various issues such as Great American and later the G.L.c. 93A claim against Smola, rather than good faith bargaining on the merits of the Estate’s claim.
On July 13, 1994, Smola sent a letter to Warshowsky, in which he asked the LLJUA to reconsider its coverage decision. In his letter, Smola explained that LLJUA’s attempt to claim a retroactive cancellation was “illogical” and “improper,” and that “it is absolutely unheard of for a liability policy of this nature to be cancelled retroactively for any amount of time, much less for 18 months.” Smola also stated that he was unaware of any facts supporting the LLJUA’s claim that it was prejudiced by late notice. Warshowsky forwarded a copy of Smola’s letter to Schreckinger, and she discussed the contents of Smola’s letter with Bucke.
The September 1994 Settlement Meeting and Its Aftermath
On September 29, 1994, Smola went to the LLJUA’s office for a settlement meeting. Schreckinger, Warshowsky, Bucke, Lunny, and another LLJUA representative were all in attendance. Prior to the meeting, Schreckinger and Warshowsky met with Bucke, Lunny and other LLJUA representatives to discuss what position the LLJUA would take during the meeting with Smola. Schreckinger advised the LLJUA representatives that, in his opinion, the LLJUA had two options: (1) file a declaratory judgment action to obtain a declaration that there was no coverage under the LLJUA policy for the Silva action; or (2) attempt to settle with the Estate for a small amount of money, in order to avoid the costs of a declaratory judgment action. Schreckinger recommended that the LLJUA offer the Estate $3,000, in spite of the fact that at the time, the LLJUA had a loss reserve of $50,000 on the claim. Bucke testified that a $50,000 reserve is usually set in “the most serious injury cases.” Moreover, while the $3,000 was purportedly based on defense costs for filing a declaratory judgment, the LLJUA had already set up an expense reserve of $30,000. Regardless of the reasoning behind the $3,000 settlement figure, it is evident that when Smola walked into the “settlement” meeting, the LLJUA had already made up its *275 mind that there was no coverage under the policy and it had decided that it would offer $3,000. Thus, the LLJUA decided what it would offer even before it heard Smola’s position, though it was reasonable for Smola to believe that the reason for the meeting was to “negotiate.”
The parties vigorously dispute what took place at this meeting. The version of events asserted by Smola is entirely more plausible and credible than that set forth by the LLJUA. During the meeting, Schreckinger was the primary spokesperson for the LLJUA. Schreckinger stated his view that there was no coverage under the policy, and then he offered Smola $3,000 to settle the claim. Smola stated that the $3000 offer was “unacceptable” and explained that it was insignificant in relation to LLJUA’s exposure. Smola properly viewed the $3,000 as a “nuisance” offer that certainly could have been given to him on the telephone. This was a death case involving a promising young lawyer. Smola’s statement that he rejected the offer is consistent with common sense. Most importantly, Smola’s testimony that he rejected the offer at the meeting is corroborated by Lunny’s contemporaneous notes. As the LLJUA’s claims representative assigned to handle the Silva claim, Lunny would have absolutely no motive to fabricate Smola’s rejection of the $3,000 offer.
LLJUA maintains that Smola never rejected the $3,000 offer at the September 29, 1994 settlement meeting, and that Smola said he would get back to them about the offer. The LLJUA also points to two entries in Lunny’s notes, taken some months after the meeting, suggesting that Smola had not responded to the $3,000 offer. Lunny’s contemporaneous notes from the meeting speak for themselves. To the extent that there may be some inconsistencies between Lunny’s notes from the day of the meeting and his notes some months later, the LLJUA could have called Lunny as a witness to clarify what he stated in his notes. However, the LLJUA chose not to call Lunny as a witness at trial, and I therefore infer that his testimony would have been consistent with his notes from September 29, 1994.
There was also discussion at the meeting about the Great American policies, and the possibility of the Estate pursuing a claim for coverage under those policies. One of the P&D attorneys told Smola that the. Estate had a strong coverage case against Great American and encouraged Smola to pursue this claim. Schreckinger hoped that “if (Smola) devoted his efforts [to pursuing a case against Great American] and was successful, then he would not pursue the LLJUA.” This ploy is further evidence of the attempt to manipulate and distract Smola in the hope and expectation that he would simply go away and take the Estate’s claim with him.
After the meeting ended, Smola took Warshowsky aside and told her that he was surprised to be dealing with Schreckinger, as all of his prior dealings had been with Warshowsky. Smola told Warshowsky that he was disappointed that the meeting was a “dog and pony show.” He reiterated that the $3,000 offer was inadequate. Warshowsky stated the LLJUA’s view that Great American had acted wrongfully in withdrawing its defense without filing for declaratoiy judgment, and she offered to assist Smola in a coverage suit against Great American. I find that this offer was made in furtherance of the LLJUA’s purpose of focusing attention on extraneous matters rather than dealing squarely with the merits of the Estate’s claim.
At some point later, Warshowsky called Smola and asked whether the Estate was interested in proceeding with a coverage suit against Great American. Bucke also attempted to call Smola. Smola did not return the call because the LLJUA was represented by counsel. Schreckinger also called Smola and told him that he would be handling the file because Warshowsky had become ill. After trying (unsuccessfully) to reach Smola in December 1994 and January 1995, Schreckinger advised the LLJUA not to pursue Smola any longer.
Thereafter, the LLJUA made no effort to appear for Bert’s in the Silva action, to itself intervene in the tort suit, or to file a separate declaratory judgment suit. The LLJUA made no effort to monitor the underlying tort suit against its insured by checking the docket in the Silva action during the period from September 1994 to April 1996. The LLJUA made no effort to investigate the facts relating to Bert’s liability. The LLJUA made no effort to see what investigation Great American or its defense counsel had done. The LLJUA made no effort to contact Eastern Casualty to investigate the facts relating to the cancellation. In short, despite the fact that it already had an expense reserve of $30,000 set aside to defend its insured, the LLJUA did nothing.
The LLJUA claims that it did nothing in reliance on Smola’s “assurance” that he would consider the $3,000 offer. The LLJUA’s position is that it believed Smola would not proceed with the tort suit until he responded to the LLJUA’s $3,000 settlement offer. However, as discussed above, this position is belied by Lunny’s note relating to Smola’s rejection of the offer. There was never any agreement on Smola’s part to place the tort suit on hold and I do not credit LLJUA’s claim to the contrary.
Moreover, it is disingenuous for LLJUA to suggest that it would have appeared at the assessment hearing or otherwise appeared in the tort suit had it known that Smola was pursuing a judgment.[4] The LLJUA made a knowing decision not to take any action requiring an appearance in the tort suit until after a judgment, regardless of what Smola did or said. LLJUA knew the clock was running, and at some point, it became obvious that Smola and the Estate were not going to accept the $3,000 offer (even if one disregards *276 Lunny’s notation that it was rejected at the meeting). Schreckinger simply advised LLJUA not to pursue Smola any longer. I find that the LLJUA was content with the status quo — it had an insured who was not requesting a defense, and it expected that Smola and the Estate’s claim would go away.
The Entry of a Default Judgment Against the Trust
As of late 1994, Smola had already received Warshowsky’s February 14, 1994 letter, in which she stated that a judgment against the LLJUA’s insured was a prerequisite to any claim for coverage, and Smola had also received the LLJUA’s May 13, 1994 disclaimer of coverage. He had attended the September 29, 1994 meeting in the hopes of negotiating a settlement, and was instead met with a lowball offer of $3,000, which he rejected. Reasonably believing that the LLJUA was not interested in defending and/or settling the tort suit, Smola continued to pursue the default judgment against the Trust that Warshowsky told him he needed.
The Court in the Silva action scheduled a status conference for January 4, 1995. Smola sent notice of the status conference to Richman and Fortun at their homes and at the address where Bert’s Restaurant was located. It is a fair inference that Richman and Fortun received the notice. Richman’s testimony is that he received copies of various documents concerning the Silva action at his home. Richman later appeared at the assessment of damages hearing. Smola did not send a copy of the notice to LLJUA because it had steadfastly refused to provide coverage in the case.
After no one appeared on behalf of the Trust at the status hearing, an order of default was entered against the Trust on February 1, 1995. The Court sent notice of the default to the address where Bert’s Restaurant was located. On July 5,1995, the Estate filed a motion for assessment of damages, and a notice of the motion asking the Court to schedule an assessment of damages hearing on August 22, 1995. Smola sent notice of the motion to Richman and Fortun at their homes, and at the address where Bert’s Restaurant was located. Again, it is a reasonable inference that Richman and Fortun received this notice. Smola did not notify the LLJUA of these proceedings because of its prior refusal to provide coverage. Despite the fact that the LLJUA had insureds who were defendants in the suit, and that Smola never agreed to place a hold on the tort suit, LLJUA failed to check the docket to keep tabs on how the Silva claim was proceeding.
Smola was contacted by Fortun’s private counsel and together they worked on scheduling the assessment of damages hearing. Once Fortun was dismissed on December 5, 1995 due to his discharge in bankruptcy, Fortun’s attorney did not participate in any further proceedings in the tort suit. The hearing on the motion for assessment of damages was rescheduled on at least four separate occasions. The Court sent notices of the original and rescheduled hearing dates to Richman and Fortun at their homes, and to the address where Bert’s restaurant was located.
The hearing on the Estate’s motion for assessment of damages was ultimately held on January 26, 1996. Only Smola and Richman attended the hearing. The judge (DelVecchio, J.) met with Richman and Smola in a half-hour lobby conference prior to the hearing. At this lobby conference, Smola agreed that Richman could be dismissed from the case, as he had been discharged in bankruptcy on December 3, 1991. The judge asked questions concerning the status of the Trust. Richman was aware that the Trust was the subject of a motion for assessment of damages and he voiced no objection to the entry of judgment against the Trust. Richman is a sophisticated businessperson, and I find that he knew full well the implications of the assessment of damages hearing. The LLJUA was not discussed at this conference, since it had refused to defend or provide coverage, and it had not filed an appearance in the suit.
At the formal hearing, the judge was told about the parties, the history of the case, and the grounds for the default. The judge also was told that the defendants included the Trust and that Richman and Fortun were the trustees. As in the ordinary course, the judge reviewed the relevant pleadings, assured herself that Richman had understood what was happening with respect to the Trust, and determined that it was appropriate to proceed with judgment. Smola filed a motion with a report from a vocational expert in support of the assessment of damages. On February 2, 1996, the court assessed damages against the Trust and R/F Enterprises, Inc. in the amount of $2.1 million. On February 22, 1996, the court entered judgment against the Trust and R/F Enterprises, Inc.[5] in the amount of $2,112,081 plus pre-judgment interest at 12% and costs of $110.[6] The court sent notice of the judgment to Smola, Richman, and to the address where Bert’s was located.
The Estate’s April 1996 Letter to the LLJUA
On April 22, 1996, the Estate’s new counsel Beauregard & Burke (“Beauregard”) send LLJUA a letter demanding that LLJUA provide coverage for the default judgment up to the applicable policy limit. Smola was copied on the letter. This letter was the first notice to the LLJUA that the Estate had obtained a default judgment against the Trust. Despite the LLJUA’s assertion to the contrary, nothing in the letter indicates that Beauregard was “replacing” Smola as counsel for the Estate. Rather, Smola continued to represent the Estate, albeit in a subordinate role to Beauregard, the Estate’s new lead counsel. In an August 1996 affidavit that was filed in connection with the Estate’s opposition to the LLJUA’s postjudgment motions, Smola stated: “I am an attorney with the Law Offices of Lider, *277 Smola, and Fogarty, which represents the Plaintiff Estate of John Silva in this litigation.”
Bucke forwarded a copy of Beauregard’s letter to its counsel. On April 29, 1996, the LLJUA received a second letter from Beauregard. While this letter marked the first time that the Estate cited to G.L.c. 175, §112, as early as 1993 the Estate had contested the validity of the LLJUA’s claim of retroactive cancellation. Bucke forwarded a copy of this second letter to Schreckinger. The LLJUA did not respond directly to the Estate’s letters.
LLJUA’s Postjudgment Motions
In the postjudgment motions filed in the Silva action, LLJUA argued that the default judgment against the Trust was void, and that the judgment should be set aside, on the grounds that (1) the policy had been cancelled in February 1987, prior to the Silva accident; (2) the LLJUA did not receive notice of the claim until 1993, and was thereby prejudiced; and (3) Smola failed to respond to the LLJUA’s $3,000 settlement offer, and that Smola then obtained a default judgment against the Trust without notifying the LLJUA. The LLJUA also argued, for the first time, that the judgment against the Trust was void for lack of service of process. The LLJUA claims that “[b]y early June 1996, it had had the opportunity to investigate the circumstances surrounding the entry of the default judgment and had discovered that no summons or complaint had ever been served on the Trust or on the trustees in their official capacity.” I find, however, that the facts relating to the issue of service on the Trust were matters of public record that were available to the LLJUA as early as the fall of 1993, but that the LLJUA made a strategic choice not to apprize itself of these facts until after the entry of default judgment against its insured.
On December 19, 1996, this court (Connon, J.) denied the LLJUA’s motions to intervene and to set aside the default judgment after a hearing. Although the court did not issue a written memorandum of decision when he denied the LLJUA’s motions, it is clear that the court considered and rejected the LLJUA’s contention that the default judgment was void for lack of service of process. The LLJUA appealed the court’s decision, and on July 27, 2000 the Appeals Court upheld the order, thereby affirming the validity of the default judgment.
The LLJUA’s Notice of Potential Claim to Eastern
Since its initial coverage opinion in 1994, the LLJUA has steadfastly maintained that the actions taken by Eastern amounted to a valid retroactive cancellation of the LLJUA policy, with an effective date of February 1987. However, in a June 6, 1996 letter to Eastern, the LLJUA placed Eastern on notice of a potential claim for indemnification in the event that the Estate was successful in its claim against the LLJUA. In the letter, Bucke stated; “It is clear from a review of the underwriting file that Eastern Casualty should have issued a notice of cancellation well before the date of loss, and thus, there would be no issue regarding a retroactive cancellation, as the plaintiff claims, after the date of loss.” However, this very concern did not give LLJUA pause when it denied coverage under the Policy in response to the Estate’s demand.
LLJUA’s G.L.c. 93A Suit Against Smola
On September 19, 1997, LLJUA sent a G.L.c. 93A demand letter to Smola, claiming that he had deceived LLJUA into not following up on events in the tort suit because he had not responded to LLJUA’s $3,000 settlement offer. On October 24, 1997, LLJUA sued Smola, claiming fraud and violation of G.L.c. 93A. LLJUA knew, or at the very least should have known, that Smola remained as counsel for the Estate in the tort suit. Smola had earlier filed an affidavit in which he represented that he represented the Estate.
The contemporaneous notations regarding the suit against Smola indicate that the LLJUA in its deliberations and actions connected the defense of the Estate’s claim to its prosecution of the G.L.c. 93A claim against Smola. For example, the first reference in LLJUA’s notes to the claim against Smola came on a date when LLJUA was responding to a new demand from the Estate, in the context of pushing for mediation, and not in the context of new information regarding Smola. Although the conduct complained of in the LLJUA’s complaint concerns actions allegedly taken by Smola between 1994 and 1996, there is no mention of a possible suit against Smola until the fall of 1997 after pressure for settlement from the Estate’s new counsel and just prior to a scheduled mediation.
The claim file notes raise an additional inference that the claim against Smola was a contrivance to affect settlement negotiations, and nothing more. Although the parties agreed not to discuss the Smola suit at mediation, the LLJUA inexplicably brought the attorney it had retained to prosecute the G.L.c. 93A action against Smola to the mediation.
LLJUA’s Responses to the Estate’s G.L.c. 93A Demand Letters
On January 16, 1998, the Estate sent a G.L.c. 93A demand letter to LLJUA. The Estate demanded that the LLJUA pay the $500,000 limits of the LLJUA policy plus $832,849 in postjudgment interest that had accrued on the default judgment. The letter incorporated by reference Beauregard’s letter dated April 22, 1996. Beauregard asserted that the LLJUA had failed to effectuate prompt, fair and equitable settlement of the Estate’s claim, thereby forcing the Estate to file suit. Beauregard also alleged that the LLJUA had filed suit against Smola in an effort to influence the resolution of the Estate’s claim in general, and a recent mediation *278 in particular, and that by doing so, the LLJUA had thrust itself into trade or commerce.
By letter dated February 12, 1998, LLJUA responded to the Estate’s demand by declining to make any offer of settlement. According to the letter, LLJUA claimed that it was not subject to G.L.c. 93A, and that even if it were, the LLJUA had not violated that statute. LLJUA also reiterated its various defenses to this action. On March 6, 1998, the Estate again demanded that the LLJUA pay the default judgment, this time pursuant to G.L.c. 93A, §9. The Estate offered to settle the case for $750,000. By letter dated April 1, 1998, the LLJUA responded that nothing in the Estate’s March 6, 1998 letter changed the LLJUA’s position.
The LLJUA’s Operation
The defendant in the reach and apply action, the Liquor Liability Joint Underwriting Association of Massachusetts (“LLJUA”), is a “temporary, nonexclusive joint underwriting association” established by the Massachusetts Legislature on July 31, 1985. St. 1985, c. 223, §2. The LLJUA’s statutory mandate is to provide liquor liability insurance to every licensed seller and distributor of alcohol who desires liquor liability insurance, but who cannot obtain such insurance in the commercial market. St. 1985, c. 223, §5.
The purpose of the LLJUA is to provide liquor liability insurance on a “self-supporting” basis. St. 1985, c. 223, §2. The LLJUA has no owners or shareholders. The Commonwealth requires all insurers who provide personal injury liability insurance in Massachusetts to participate in the LLJUA’s operations. St. 1985, c. 223, §2. The Commissioner of Insurance (“the Commissioner”) fixes the LLJUA’s premium rates at a level sufficient to cover insured claims and claim adjustment expenses. St. 1985, c. 223, §6. Operating deficits of the LLJUA may be offset by temporary contributions from the insurer “members,” but only until the deficits are recouped through prospective rate increases. St. 1985, c. 223, §§6, 7.
In addition to setting the LLJUA’s premiums, the Commissioner establishes the policy limits that the LLJUA is permitted to provide. St. 1985, c. 223, §4. The Commissioner also is responsible for issuing a Plan of Operation that governs the operations of the LLJUA. St. 1985, c. 223, §4. The Commissioner is required to examine the LLJUA’s affairs at least annually. St. 1985, c. 223, §12. In practice, however, the Commissioner does not exercise oversight of LLJUA’s day-to-day operations.
From its formation in 1986 through late 1991, the LLJUA did not have any employees. Instead, pursuant to the express authority granted in its enabling legislation, the LLJUA contracted with a series of servicing carriers to conduct its operations. St. 1985, c. 223, §3. The servicing carriers performed all of the LLJUA’s underwriting, policy processing, accounting, billing, collections, claims handling and other operations.
Commerce Insurance Company, Inc. (“Commerce”) was the LLJUA’s servicing carrier from the time the LLJUA first began operations until on or about February 1, 1987. Commerce had plenary authority to make all decisions relating to the servicing of LLJUA policies, including the cancellation of LLJUA policies. On or about February 1, 1987, Eastern Casualty Insurance Company (“Eastern”) became the LLJUA’s servicing carrier. Eastern was the LLJUA’s servicing carrier through on or about December 31, 1988. Eastern wrote and serviced its own insurance policies while it also serviced LLJUA policies. Like Commerce, Eastern had plenary authority to make all decisions relating to the servicing of LLJUA policies, including the cancellation of LLJUA policies.
The LLJUA’s servicing agreement with Eastern provided that Eastern had the power and duty to, among other things: a) act generally in the name of the LLJUA; b) issue, deliver and service LLJUA insurance policies; and c) collect all sums receivable for the LLJUA, pay sums owing for the LLJUA and dispense funds on behalf of the LLJUA, all in accordance with prudent fiscal control. Although the LLJUA did not impose any requirements on either Commerce or Eastern regarding the cancellation of policies, such cancellations still had to be consistent with the terms of LLJUA’s insurance policy. Neither Commerce nor Eastern had the authority to unilaterally change the terms of LLJUA’s insurance policy.
In the fall of 1991, the LLJUA decided that instead of employing a servicing carrier, it would directly hire its own employees to handle claims, issue policies and otherwise conduct the day-to-day business of the LLJUA. It was then that the LLJUA hired Bucke to serve as Executive Director of the LLJUA. Bucke began working for the LLJUA in October 1991. One of Bucke’s responsibilities as Executive Director was to supervise the LLJUA’s handling of claims.
In 1992, the LLJUA had a net operating deficit of $266,638. By 2001, the LLJUA had a net operating surplus of $27,939,000. Although the LLJUA contends that this surplus was merely the result of reduced claim expenses and growth in the LLJUA’s investments of premiums as a result of the rising stock market of the 1990s, I find that the LLJUA’s surplus was also the result of conscious business decisions designed to increase the LLJUA’s assets by gaining a greater share of the market for liquor liability insurance.
In the mid-1990s, the LLJUA surveyed liquor licensees to determine how many licensees did not have liquor liability insurance. The survey showed that approximately sixty to seventy percent of the licensees did not have liquor liability insurance. The LLJUA took steps to increase awareness among both liquor licensees and insurance brokers of the LLJUA and the coverage that it offered. These steps included sending informational materials to licensees and to brokers, *279 placing notices in insurance industry publications and appearing at hospitality industry trade shows. These steps also included visiting insurance brokers and increasing the commission that the LLJUA paid to brokers for new business.
In addition to raising awareness about the availability of LLJUA insurance policies, the promotional activities undertaken by the LLJUA in the mid-1990s served another purpose as well, to increase the LLJUA’s market share. In the early 1990s, there was an overall decline in the number of policies issued by the LLJUA. The LLJUA responded to this decline by increasing its marketing activities. The minutes from meetings of the LLJUA Board of Directors during this period of time indicate that the LLJUA was motivated, at least in part, by a desire to increase its market share.
At a Board meeting in March 1997, the LLJUA discussed targeting both agents and licensees “to penetrate the market effectively.” To effectuate this goal, the LLJUA hired a marketing firm to engage in advertising. As part of its marketing efforts, the LLJUA solicited agents by advertising about increased commission rates. It is evident that the LLJUA intended to create incentives for agents to send licensees to the LLJUA. In addition, the LLJUA solicited licensees by advertising about “horror stories.” On their face, these advertisements would appeal to all liquor licensees, regardless of whether they could obtain insurance elsewhere. Although LLJUA is supposed to be an insurer of last resort, this activity was not limited in a way that would only target its statutory market. These marketing activities designed to “penetrate the market” were not motivated solely by legislative mandate, but rather by LLJUA’s desire to increase the LLJUA’s market share.
Around the same time that the LLJUA was engaged in a marketing campaign designed to boost its market share, it also decided to reduce its premium rates. This had the effect of making the LLJUA a more attractive option to licensees in search of liquor liability insurance. I do not credit the LLJUA’s assertion that this reduction in premiums was done solely to make LLJUA liquor liability policies more affordable to licensees. The LLJUA’s Board minutes demonstrate that the decision to reduce premiums was motivated, at least in part, by a desire to compete with private insurers in the voluntary market. For instance, at its October 1993 meeting, the Board referred to the “cream of the crop” finding better rates elsewhere. The March 1995 minutes demonstrate that this was not an aberration, but rather an ongoing business strategy to gain market share. At this meeting, the LLJUA Board expressed concern that potential insureds were obtaining insurance elsewhere. At its April 1996 meeting, the LLJUA Board addressed a decrease in the monthly figures for written premiums. The minutes state: “The monthly figures prompted a discussion of the voluntary market conditions and the substantially lower voluntary market rates for certain classes of business. This in turn prompted discussion of the need to ensure that agents were made aware of the LLJUA’s rate revisions. After some discussion, [Chairman] Joe Quinn decided to schedule an Operations Committee meeting to address the need to increase insurance agents and insureds’ awareness regarding the lowered LLJUA rates.”
These excerpts from the LLJUA’s minutes demonstrate that the LLJUA’s decision to lower its rates came in response to competition from the voluntary market. As is the case with its decision to “penetrate the market” through an aggressive marketing campaign, the LLJUA’s decision to lower its rates in order to solicit the “cream of the crop” is wholly inconsistent with its legislative mandate. According to its enabling statute, the LLJUA’s rate decisions should be limited to addressing the needs of those insurers “who cannot obtain [liquor liability] insurance in the commercial market." St. 1985, c. 223, §5. The fact that its marketing activities served the goal of increasing coverage among the uninsured does not change the fact that these activities, like the lower rates and the increased commissions to agents, served LLJUA’s purpose to compete in the voluntary market.
LLJUA operated with a profit motive purposely to increase its burgeoning bottom line and, therefore, it had an incentive to increase its market share. Since its inception in 1985, the LLJUA has never distributed any portion of its excess revenues back to its policyholders. Since 1992, the LLJUA’s cash holdings have increased from a deficit of $266,538 to a surplus of $27,993,000 in 2001. Perhaps not coincidentally, the LLJUA has gone from a small operation with no employees into a significant player in the market for liquor liability insurance during this period of time. Indeed, it appears that without its surplus and investment income, the LLJUA might have difficulty justifying the amount of expenses it incurs vis-a-vis the amount of business it writes. For example, in 2000 the LLJUA wrote $741,607 in business, but it had $640,264 in salaries and $147,702 in general legal and accounting expenses. Therefore, I find that the LLJUA did have a profit motive, that it acted in furtherance of this desire to increase its market share and that it accumulated substantial profits.
RULINGS OF LAW
1. THE MEASURE OF DAMAGES OWED TO THE ESTATE IN THE REACH AND APPLY ACTION
In the prior proceeding on the parties’ cross motions for summary judgment, this court (Quinlan, J.) entered summary judgment for the Estate on its reach and apply claim against LLJUA. The assessment of damages issue was submitted to this court in conjunction with the trial on the Estate’s G.L.c. 93A claim. Although the parties now agree that LLJUA is obli *280 gated to pay the policy limit and postjudgment interest, they disagree sharply on the amount of postjudgment interest to be assessed. The Estate argues that under the Policy’s Supplementary Payments provision, the LUUA is obligated to pay postjudgment interest on the entire amount of the underlying judgment. LUUA counters that the Supplementary Payments provision does not apply and that the Estate is entitled only to postjudgment interest on the amount of the judgment that is within the $500,000 policy limit. I look first to the language of the Supplementary Payments provision to determine the merits of the competing arguments.
The Policy in relevant part provides as follows:
C. Supplementary Payments
We will pay with respect to any claim or “suit” we defend:
4. All costs[1] taxed against the insured in the “suit.”
5. All interest on the full amount of any judgment that accrues after entry of the judgments and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.
These payments will not reduce the limits of insurance of this Policy.
When interpreting the provisions of the Policy, the court “must construe the words of the policy according to the fair meaning of the language used, as applied to the subject matter...” Johnson v. Hanover Ins. Co., 400 Mass. 259, 266 (1987) (quotations omitted). “When the provisions of a policy are plainly and definitively expressed, the policy must be enforced in accordance with the terms.” Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. 422, 427 (1995). The Supplementary Payments provision is decir and unambiguous. It applies only when the LUUA “defends” the suit. There is no dispute here that the LUUA did not “defend” the suit brought by the Estate.
Based only on the clear language of the Policy, the fact that LUUA did not defend the underlying suit would be dispositive. However, the Estate argues that LUUA should be estopped from relying on its failure to defend the suit because it wrongfully cancelled the Policy, setting in motion the chain of events that resulted in the default judgment in the underlying suit. In addition, the Estate claims that LUUA had a duiy to defend and that it made a conscious decision not to do so, even after notice of the underlying suit. LUUA responds that: a) it had no duty to defend the suit because the insured never tendered the defense; b) it had no duty to defend because there was no “suit” against the Trust; and c) the Estate lacks standing to claim estoppel based on any breach of the duty to defend its insured in the underlying suit. I conclude that estoppel applies in the circumstances of this case and that, as a result, LUUA is obligated to pay postjudgment interest on the full amount of the judgment as required by the Supplemental Payments provision of the Policy.
Estoppel is an equitable principle which, in the context of this dispute, “arises when an insurer or the insured has brought about or allowed such conditions as make it inequitable for that party to claim a right to which the party otherwise would be entitled.” See Holmes’ Appleman on Insurance 2d §8.1. Though the test for estoppel has been variously stated,[7] “[t]he essential factors giving rise to an estoppel are (1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2.) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made. (3.) Detriment to such person as a consequence of the act or omission. Clickner v. City of Lowell, 422 Mass. 539, 544 (1996); Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 123 (1992), quoting Cleaveland v. Malden Sav. Bank, 291 Mass. 295, 297-98 (1935). The party asserting the estoppel ’’has a heavy burden to prove that all [three] elements are present." Harrington v. Fall River Hous. Auth., 27 Mass.App.Ct. 301, 309 (1989) (citation omitted). In addition, the party must establish that its reliance on the asserted conduct was reasonable. Ford v. Rogovin, 289 Mass. 549, 553 (1935); Phipps Products Corp. v. Massachusetts Bay Transp. Authority, 387 Mass. 687, 693 (1982).
The conduct setting up the estoppel as asserted here by the Estate is LUUA’s retroactive cancellation of the Policy. In general, the cancellation of a policy of insurance signals the termination of the relationship between the insured and the insurer and it forecloses the opportunity for notice of claims, whether valid or not, against the policy. Predictably, the cancellation of the Policy induced LUUA’s insured to fail to give notice of the underlying suit and to tender the defense, actions it otherwise would have taken. LUUA, in turn, failed to defend the suit. The insured, in whose place the Estate now stands,[8] relied on this cancellation to its detriment. But for the cancellation, the insured would have tendered the defense triggering LUUA’s duty under the Policy to a defend the suit.[9] LUUA attempts to escape responsibility for the detriment caused by the cancellation, arguing that its failure to defend was the fault of the insured who never tendered the defense. However, this overlooks the fact that the tender otherwise would have occurred if LUUA had not retroactively cancelled the Policy.
The final element of estoppel, reasonable reliance on the cancellation, is met as well. The insured acted reasonably in relying on LUUA’s representation that the Policy was cancelled even though the retroactive cancellation was of questionable legal validity.[10] LUUA was the final arbiter of whether or not the Policy was cancelled and it was obligated to effect the can *281 cellation in a manner consistent with the law. In these circumstances, it would not be fair or equitable to hold the insured responsible for knowing and investigating the legal propriety of LLJUA’s action.
Finally, I deal with LLJUA’s argument that the Estate has no standing to assert rights flowing from the failure to defend the suit because the duly to defend was an obligation owed to the insured and not to the Estate. In support of this position, LLJUA cites San Diego Housing Commission v. Industrial Indemnity Co., 95 Cal.App.4th 669 (2002). However, the court’s holding in Industrial Indemnity does not govern the issue before me. In that case, the plaintiff, a judgment creditor, attempted to assert the right to supplemental payments under a third-party beneficiaiy contract theory. The court rebuffed that claim on the ground that the duty to defend was owed to the insured and that no rights accrued to the judgment debtor under a third-party beneficiary theory. Unlike the plaintiffs in Industrial Indemnity, the Estate is not asserting the right to coverage under the Supplemental Payments provision on a contract theory. Rather, it is making an equitable argument that the LLJUA should be held to all the natural and probable consequences of its wrongful cancellation of the Policy.
Taken together, these circumstances justify application of the estoppel doctrine. LLJUA cannot, therefore, escape liability for postjudgment interest on the total amount of the default judgment.
Having decided that the LLJUA is obligated to pay interest on the full amount of the judgment under the Supplemental Payments provision, I now consider the calculation of the total postjudgment interest due and whether, as LLJUA argues, sums paid to the Estate by other insurers[11] should be set off from the interest calculation. The Estate attempts to justify a postjudgment interest calculation that ignores the payments from the other insurers. It argues that LLJUA is not entitled to the benefit of the $110,000 paid to the Estate by the auto insurers because of its failure to defend its insured or appear on its own behalf. The Estate seeks to avoid a deduction of the $750,000 paid by Great American, contending that Great American’s payment was pursuant to an “excess policy” and that its payments cannot be applied to damages covered by other insurance. I agree with LLJUA that the underlying default judgment on which the Estate brought reach and apply claims against LLJUA and Great American pursuant to G.L.c. 175, §113, defines the scope of the Estate’s right to recover damages against both insurers. The Estate has not suggested any basis other than G.L.c. 175, §113 on which it was entitled to receive the $750,000 payment from Great American. General Laws Chapter 175, Section 113 grants an injured party the right to insurance proceeds but only insofar as necessary to satisfy the underlying judgment. Saunders v. Austin W. Fishing Corp., 352 Mass. 169 (1967). To accept the Estate’s argument that postjudgment interest should be calculated without deducting the $750,000 payment from Great American would expand its rights beyond that intended by the statute and I decline to do so. The calculation of the postjudgment interest will not be affected by the payments from the auto insurers because those payments were made prior to the entry of the underlying default judgment and are independent of the reach and apply action.
With these ground rules, the postjudgment interest to be assessed against LLJUA is calculated in Exhibit A attached hereto.
2. THE ESTATE’S G.L.c. 93A CLAIM.
The Estate’s G.L.c. 93A claim as articulated in its demand letters is premised on the allegation that LLJUA failed to pay its insured’s policy limit on the default judgment in the underlying suit after liability was reasonably clear. LLJUA disputes the claim arguing that as a legislatively created “non-profit” joint underwriting association, it is not engaged in “business or commerce” and, therefore, not subject to G.L.c. 93A. Alternatively, LLJUA contends that even if it is subject to G.L.c. 93A, it was not obligated to accede to the Estate’s demand because LLJUA’s liability was not reasonably clear. I conclude that LLJUA is subject to G.L.c. 93A and that because its liability to the Estate was reasonably clear, the failure to effect a prompt, fair and equitable settlement of the Estate’s claim violated G.L.c. 93A.
A. LLJUA IS SUBJECT TO G.L.c. 93A.
The analysis of whether a claim may be brought against LLJUA under G.L.c. 93A requires first an examination of the relationship between the relevant provisions of G.L.c. 93A and G.L.c. 176D which prohibit unfair or deceptive acts or practices in “trade or commerce”[12] and in the “business of insurance”[13] respectively. An understanding of the relationship between these statutes is important because G.L.c. 176D contains no provision for a private right of action. On the other hand, G.L.c. 93A explicitly provides for private enforcement of protected rights and it includes a remedial scheme that permits the award of multiple damages and attorneys fees to a prevailing party. Notwithstanding the lack of a private right of action under G.L.c. 176D, such claims are brought under the umbrella of G.L.c. 93A by the express reference in G.L.c. 93A, §9(1) which provides that: “Any person . . . whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy six D may bring an action in the superior court. . .” Therefore, because G.L.c. 93A, §9(1) incorporates G.L.c. 176D, §3, a violation of that provision is ipso facto a violation of G.L.c. 93A and the injured party is entitled to pursue a remedy in the Superior Court under G.L.c. 93A. See Hopkins v. Liberty Mut. Ins. Co., 434 Mass. 556, 564 (2001). See also Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass. 671, 675 (1983). With this *282 background, I turn to the threshold issue in resolving the merits of the Estate’s claim under G.L.c. 93A, §9: whether LLJUA is subject to G.L.c. 176D which in turn subjects it to liability under G.L.c. 93A.
The persons subject to G.L.c. 176D are defined in G.L.c. 176D, §l(a) as follows:
(a) “Person,” any individual, corporation, association, partnership . . . any other legal entity . . . engaged in the business of insurance, including any joint underwriting association established pursuant to law.
(Emphasis supplied.) Both LLJUA and the Estate overreach in advocating for their respective positions on the interpretation of this provision of the statute. The Estate reads it too broadly, arguing that it conclusively establishes that LLJUA is in the “business of insurance” and, therefore, subject to G.L.c. 93A. On the other hand, LLJUA reads it too narrowly, asserting that G.L.c. 176D, §1(a) merely subjects LLJUA to the full force of sanctions available under G.L.c. 176D, not to multiple damages under G.L.c. 93A. As explained below, neither interpretation is correct. The statute, G.L.c. 176D, §1(a), does not automatically subject LLJUA to liability under G.L.c. 93A. Nor does it shield absolutely LLJUA from liability under G.L.c. 93A. Rather the plain language of G.L.c. 176D, §l(a) merely includes LLJUA within the class of persons or entities subject to G.L.c. 176D and, by extension, G.L.c. 93A if and only if it engages in the “business of insurance.”
A careful reading of the amended language does not support the interpretation urged by the Estate. The legislature intended and accomplished the much narrower goal of including the LLJUA and any “individual, corporation, association, partnership [or] any other legal entity” within the definition of persons subject to the statute only if and when “engaged in the business of insurance.” The phrase “business of insurance” limits the broad reading that, without this qualification, would include every “individual, corporation, association, partnership [or] . . . other legal entity” within the reach of the statute, regardless of whether the person or entity was engaged in business and without regard to the type of business. This interpretation defies common sense and is absurdly expansive given that the statute is concerned only with regulating those persons or entities in the “business of insurance.”
Similarly, LLJUA advocates a reading of the statute that overlooks entirely the context of the amendment and the relationship between G.L.c. 93A and G.L.c. 176D. LLJUA takes the position that it cannot be subject to liability under G.L.c. 93A because the Legislature did not expressly amend G.L.c. 93A to bring “joint underwriting associations” within its purview. An express reference in G.L.c. 93A to joint underwriting associations such as LLJUA was not necessaiy because the legislature had already created a connection between G.L.c. 93A, §9 and G.L.c. 176D, §3 (9) as discussed above. Hopkins, 434 Mass. at 564. By linking the two statutes, the Legislature expressly provided for a private right of action under G.L.c. 93A for violations of G.L.c. 176D. If there was any intent to shield LLJUA or other joint underwriting associations from G.L.c. 93A liability, the Legislature certainly could have accomplished that purpose by making an explicit exception for those entities. It did not do so.
Moreover, it may be presumed that the Legislature was aware of the Court’s holding in Poznik v. Massachusetts Med. Prof'l. Ins. Ass’n, 417 Mass. 48 (1994) (the Massachusetts Medical Professional Insurance Association (MMPIA) does not engage in “trade or commerce,” and, therefore, is immune to suit under G.L.c. 93A) when it amended G.L.c. 176D so as to bring “joint underwriting associations” such as LLJUA within its purview. As the Supreme Judicial Court has stated, “[w]hen amending statutes, we presume that the Legislature is aware of the prior state of the law as explicated by the decisions of this court.” L.W.K. v. E.R.C., 432 Mass. 438, 455 (2000) (Cowin, J., dissenting), citing Opinion of the Justices, 408 Mass. 1215, 1222 (1990).
Perhaps recognizing that its suggested interpretation is inconsistent with the plain words of the statute, LLJUA argues next that it cannot be subject to G.L.c. 176D because, as a legislatively created underwriting association, it is not engaged in the “business of insurance.” It relies principally upon the Supreme Judicial Court’s decision in Poznik, 417 Mass. at 51-53.
The plaintiff in Poznik alleged that the MMPIA had engaged in unfair claim settlement practices, in violation of G.L.c. 176D, §2(a) (1992 ed.)[14] and G.L.c. 93A, §2. Id. at 49. The Court began its analysis by noting that the MMPIA is a “temporary, nonexclusive, nonprofit joint underwriting association whose purpose is to provide medical malpractice insurance on a self-supporting basis.” Id. at 50, citing St. 1975, c. 362, third par. The Court then looked at whether the MMPIA was in the “business of insurance” so as to subject it to liability under G.L.c. 176D. Poznik, 417 Mass. at 50-51. The “business of insurance,” according to the Court, involves “profit driven business decisions about premiums, commissions, marketing, reserves and settlement policies and practices.” Id. at 51. For the court, the most compelling factor was that MMPIA can have no private profit. Any revenue in excess of its liabilities and expenses must be returned to its policyholders or held as reserves to cover future liabilities. Id. Moreover, unlike a private insurer, the MMPIA assumes no risk of loss, because if it operates at a deficit, “it may seek to recover from all ‘licensed physicians or hospitals insured under a policy of medical malpractice insurance, whether obtained through the [MMPIA] or not.’ ” Id., quoting St. 1975, c. 362 §6, eighth par. Also, the MMPIA has no discretion over whom it insures or the rate of its premiums. *283 Id. at 51. Given these considerations, the Court concluded that the MMPIA “provides insurance policies pursuant to legislative mandate, but it is not in the business of insurance.” Id. (emphasis in original). Therefore, the Court held that the MMPIA is not subject to liability under G.L.c. 176D.
The Court also considered whether the MMPIA was engaged in “trade or commerce,” i.e. whether it acted in a business context, so as to subject it to liability directly under G.L.c. 93A.[15] Relying on its holding in Barrett v. Massachusetts Insurers Insolvency Fund, 412 Mass. 774 (1992), wherein the Court determined that the Massachusetts Insurers Insolvency Fund (MIIF) was not engaged in “trade or commerce,” the Court likewise concluded that G.L.c. 93A was inapplicable to the MMPIA. “The character of the MMPIA as a ‘statutorily mandated, nonprofit’ association is similar to the MIIF. The MMPIA’s transactions, like those of the MIIF, are ‘motivated by legislative mandate, not business or personal reasons.’ ” Poznik, 417 Mass. at 52, quoting Barrett, 412 Mass. at 111. The Court relied upon many of the same factors it had considered in its analysis under G.L.c. 176D, such as the MMPIA’s legislative mandate,- as well as the fact that the MMPIA does not assume the risk of loss. Poznik, 417 Mass. at 52-53. Since “Chapter 93A imposes liability on persons seeking to profit from unfair practices,” the Court found the deterrence goals of G.L.c. 93A inapplicable to an entity not motivated by business reasons, such as the MMPIA. Id. at 53.
LLJUA argues that the holding in Poznik is dispos-itive of the issue before me. For the reasons explained more fully below, I disagree. Poznik did not hold that a legislatively created underwriting association could never be subject to G.L.c. 176D or to G.L.c. 93A. It simply held that MMPIA, holding true to its legislative mandate, was not engaged in the “business of insurance” and, therefore, not subject to G.L.c. 176D.
Moreover, the cases addressing this issue in similar contexts make clear that status of a legislatively created entity such as LLJUA is not fixed for all time as at its genesis. Planned Parenthood Fed’n of Am. v. Problem Pregnancy of Worcester, Inc., 398 Mass. 480, 492-93 (1986). The courts routinely look beyond form to substance where a party seeks a remedy under G.L.c. 93A for injury caused by the alleged unfair or deceptive acts or practices of another party not generally assumed to operate in a business context. See e.g., Lafayette Place Assocs. v. Boston Redevelopment Auth., 427 Mass. 509 (1998); All Seasons Services, Inc. v. Comm’r. of Health and Hospitals, 416 Mass. 269 (1993). And when such an entity steps outside of its traditional non-business role and engages in trade or commerce, the court has permitted the claim to be brought under G.L.c. 93A. See Linkage Corp., v. Trustees of Boston University, 425 Mass. 1 (1997) (despite Boston University’s status as nonprofit charitable institution, the agreement with the plaintiff for services to the university’s corporate education center was a “commercial transaction” which subjected the university to liability under G.L.c. 93A); Boston v. Aetna Life Ins. Co., 399 Mass. 569, 574-75 (1987) (as the as-signee of patient insurance benefits, Boston City Hospital was a person engaged in trade or commerce with standing to bring a G.L.c. 93A claim against the insurer); Spence v. Boston Edison Co., 390 Mass. 604, 615-16 (1983) (“Boston Housing Authority was engaged in trade or commerce in contracting with Boston Edison for steam in public housing”).
Therefore, to resolve the issue before me, I look not to what LLJUA says it was created to do but to how LLJUA operates in fact. I conclude that LLJUA is subject to G.L.c. 93A on two separate and independent grounds: 1) LLJUA operates outside of its legislative mandate as a profit making enterprise engaged in the “business of insurance”;[16] and 2) LLJUA thrust itself into the “business of insurance” with respect to the particular transaction involving the settlement of the Estate’s claim when it filed the G.L.c. 93A action against attorney Smola. I discuss each of these grounds in turn.
1. LLJUA is subject to G.L.c. 93A because its methods of operation define it as being engaged in the “business of insurance.”
The factors to be considered in analyzing whether LLJUA engaged in the “business of insurance” are those articulated in Poznik . The “business of insurance” involves “profit driven business decisions about premiums, commissions, marketing, reserves and settlement policies and practices.” Id. at 51. Indeed, the profit motive is the essence of a business operation and this was the key factor in Poznik. Unlike the MMPIA however, LLJUA is not constrained by an enabling statute expressly prohibiting profits or requiring that profits be returned to policyholders.[17] Without this constraint that was so vital to the court’s holding in Poznik, LLJUA is on a radically different footing than MMPIA. And it has taken full advantage of this apparent latitude to do precisely what could not be done by MMPIA; it has accumulated profits.[18] Since the early nineties, LLJUA has amassed an ever growing surplus[19] which puts it on a par with businesses overtly and purposely committed to the pursuit of profit.[20] LLJUA’s profit is far in excess of what it reasonably needs to sustain its operation because, as noted above, the profit represents available cash over and above the reserve. In addition, the fact that LLJUA has never returned profits to its members or policyholders is further evidence that it has treated its legislative mandate as a business opportunity. Instead of distributing the profits, LLJUA has invested the cash increasing substantially its bottom line. Given this financial reality, LLJUA is indisputably a profit making enterprise. As such, LLJUA cannot credibly claim that it operates within its legislative mandate as a “self supporting” entity.[21]
*284 LLJUA’s profit did not occur by happenstance. Its astonishing track record for amassing profit is attributable to conscious and purposeful choices it made concerning premiums, marketing and settlement policies and practices, all factors to be taken into account in applying the test set forth in Poznik. These choices took LLJUA beyond its legislative mandate to “provide liquor legal liability insurance to sellers and distributors of alcohol previously unable to obtain liability insurance in the private market.” LLJUA v. Hermitage Ins. Co., 419 Mass. 316, 318 (1995). Beginning in the mid-nineties, LLJUA became concerned when the number of policies written began to slip. To shore up its position, LLJUA shifted the focus of its operation to increase its market share. Though LLJUA’s legislative mandate contemplated its role as a passive player in the underwriting of liquor liability insurance for those unable to purchase it in the voluntary market, LLJUA considered ways to attract the “cream of the crop” and to “penetrate the market effectively.” Such concerns belie LLJUA’s claim to be merely an adjunct to the voluntary liquor liability insurance business. Nonetheless, LLJUA launched its sophisticated marketing campaign, increased commissions to entice brokers to write more policies and lowered its premiums in a direct appeal to the voluntary market. To be sure, LLJUA was committed to expanding coverage to those sellers and distributors of liquor without insurance. However, LLJUA’s marketing strategy was targeted to the general market rather than to its legislatively defined constituency. The success of this effort as reflected in the profits transformed LLJUA from an insurer of last resort into an active competitor for the liquor liability insurance premium dollar.
LLJUA fails the Poznik test also with respect to its settlement practices. In fighting off the Estate’s legitimate and reasonable demand for settlement of its claim, LLJUA disregarded its raison d’etre, to provide compensation for injuries caused by negligence in the sale or distribution of liquor. LLJUA’s settlement posture which involved a “lowball” offer of $3000 for this death case before the judgment, a complete lack of response to the initial demand for payment of the policy limit on the underlying judgment and a subsequent denial of the claim, clearly favored its bottom line rather than the intended beneficiaiy of the Policy. It is this kind of settlement practice, driven by the concern for profit, that places LLJUA squarely in line with insurers in the voluntary market, those indisputably in the business of insurance. The lesson of Poznik is that if LLJUA conducts itself as if it is in the business of insurance, it cannot demand the protections accorded to those insurers that stay within their legislative mandate.
It is not disputed that as in Poznik, LLJUA has no discretion as to whom it may insure and that it assumes no risk of loss. However, these constraints have not defined LLJUA’s operation. LLJUA’s profit numbers speak for themselves. It has functioned as a profit making enterprise. By amassing substantial profits and positioning itself as an alternative insurer with competitive rates, LLJUA obliterated the necessary distinction between it and insurance businesses in the voluntary market. Given these facts, I am not persuaded that the LLJUA of today is the same entity created in 1985 as a “temporary nonexclusive joint underwriting association ... to provide liquor legal liability insurance on a self supporting basis.” St. 1985, c. 223, §2.
Finally, LLJUA claims that it is not subject to G.L.c. 176D because the conduct at issue here occurred prior to November 7, 1996, the effective date of the amendment to Section 1(a). This argument fails for two reasons. First, as explained above, LLJUA or any other joint underwriting association could have been subject to G.L.c. 176D even in the absence of an amendment to the statute. All that was required was a finding that it was engaged in the business of insurance, notwithstanding its status as a legislatively created “nonprofit” entity. Second, the conduct at issue here is not limited to the period predating the amendment to G.L.c. 176D, §1(a). The Estate sent LLJUA a demand letter in 1998, almost two years after the effective date of the amendment. As discussed below, LLJUA’s conduct in failing to offer a prompt, fair and equitable settlement of the Estate’s claim was continuous, from the time of the April 1996 letter to at least the date of the January 1998 demand letter. Therefore, this argument is unavailing.
2. LLJUA is subject to G.L.c. 93A because it thrust itself into the “business of insurance” in the particular transaction involving the Estate’s claim against the Trust’s policy.
Even if LLJUA’s general modus operandi did not establish it as being engaged in the “business of insurance,” it is subject to G.L.c. 93A for the additional reason that in the particular transaction involving the Estate’s claim against the Policy, LLJUA thrust itself into the “business of insurance.” The cases recognize that an entity that is not formally engaged in trade or commerce (or in this case the business of insurance) may be subject to liability under G.L.c. 93A if the particular transaction that gives rise to the claim occurs in a business context. See Linkage Corp. v. Trustees of Boston University, 425 Mass. at 25. LLJUA identified itself with the “business of insurance” when it filed its suit against Smola claiming to have been harmed when Smola, without notice to LLJUA, secured a default judgment against LLJUA’s insured.
LLJUA’s complaint, intentionally perhaps, did not specify whether its claim was brought under G.L.c. 93A, §9 which creates a right of action for consumers or §11 which allows claims based on unfair or deceptive acts or practices to be brought by one business entity against another business entity. Nonetheless, it seems clear that the claim could only have been brought pursuant to G.L.c. 93A, §11. LLJUA, given its *285 purpose and operation, is not in any sense a “consumer” such that the Smola lawsuit is a “consumer” action under G.L.c. 93A, §9. In Dodd v. Commercial Union Ins. Co., 373 Mass. 72 (1977), the Supreme Judicial Court observed that the purpose of G.L.c. 93A, §9 is to “provide a more equitable balance in the relationship of consumers to persons conducting business activities.” Id. at 80. (emphasis supplied). Clearly G.L.c. 93A, §9 contemplates the situation where one party in the bargain, the consumer who buys goods or services, is at an economic disadvantage in relation to the business, the seller of those goods or services. That is not the case here.
LLJUA, as the insurer of the alleged tortfeasor, was not on an unequal footing vis a vis Smola as the attorney for the Estate in the underlying tort action. In the first instance, LLJUA had the right and duty to defend its insured. Camp, Dresser & McKee v. The Home Ins. Co., 30 Mass.App.Ct. at 322. By satisfying this obligation, LLJUA could have empowered itself to prevent all of the harm that it claims to have been caused by Smola’s actions. Even putting aside any duly to defend, LLJUA was not at Smola’s mercy to gain access to information about the progress of the lawsuit. It was aware of the Silva action and that information concerning the progress of the suit was readily available by checking the court docket. In addition, as discussed below, LLJUA easily could have filed a declaratory judgment action to establish the nature of its obligation under the Policy and to gain access to the information it claims Smola was obligated to provide to it. LLJUA was represented at all times by able and experienced counsel, and it was well within its rights under the Policy and under the law to affirmatively assert and defend its interests. Put simply, there was no inherent inequality in the relationship between LLJUA and Smola such that the Smola action is properly characterized as a “consumer” action under G.L.c. 93A, §9.
LLJUA is not Janus. It conveniently defined itself as being engaged in the “business of insurance” in a judicial proceeding inextricably bound with the transaction at issue in the Estate’s G.L.c. 93A claim. LLJUA cannot now show itself as a legislatively created “nonprofit” entity beyond the reach of G.L.c. 93A. Also, LLJUA’s about face on whether it is engaged in the “business of insurance” runs counter to the doctrine of judicial estoppel. Judicial estoppel is an equitable doctrine which precludes a party from asserting a position in one legal proceeding which is contrary to a position it has already asserted in another." Fay v. Federal National Mortgage Ass’n., 419 Mass. 782, 788 (1995) (judicial estoppel applies where a parly has successfully asserted an inconsistent position in a prior proceeding). It matters not that LLJUA did not succeed on the merits of its G.L.c. 93A claim against Smola. What is important here is that LLJUA did succeed in representing itself as being engaged in the “business of insurance.” Because LLJUA engaged itself in the “business of insurance” in its handling of the Estate’s claim against the Policy, it is subject to G.L.c. 93A on the Estate’s unfair settlement practices claim. See Linkage Corp v. Trustees of Boston University, supra.
B. LLJUA FAILED IN ITS OBLIGATION TO EFFECT A PROMPT, FAIR AND EQUITABLE SETTLEMENT OF THE ESTATE’S CLAIM WHEN LIABILITY WAS REASONABLY CLEAR.
Having concluded that the LLJUA is engaged in “trade or commerce,” and is therefore subject to liability under G.L.c. 93A, this Court must now determine whether the LLJUA engaged in unfair and deceptive trade practices as defined in G.L.c. 176D.
1. The Scope of the Estate’s G.L.c. 93A Claim.
The scope of the Estate’s G.L.c. 93A claim is defined by its demand letters to the LLJUA on April 22, 1996, April 29, 1996 and January 16, 1998. Bressel v. Jolicoeur, 34 Mass.App.Ct. 205, 211 (1993) (relief foreclosed for conduct not alleged in the demand letter): Clegg v. Butler, 424 Mass. 413, 423 (1997) (Chapter 93A requires the claimants to set out specifically any activities in their demand letter as to which they seek relief; separate relief on actions not so mentioned is foreclosed as a matter of law). Taken together, these demand letters articulate a claim for G.L.c. 93A liability based on LLJUA’s failure to pay the default judgment entered against its insured in the Plymouth Superior Court on February 22, 1996 and based on LLJUA’s G.L.c. 93A lawsuit against Smola. LLJUA counters that it acted properly in refusing the pay over the policy proceeds to the Estate because its liability was not reasonably clear. For the reasons set forth below, I conclude that the refusal to pay over the policy proceeds and the filing of the lawsuit against Smola constituted unfair settlement practices in violation of G.L.c. 176D, §3(9) (f) and that as a consequence, LLJUA is liable to the Estate under G.L.c. 93A, §2 and §9.
2. Standard for G.L.c. 93A Liability
A consumer may recover damages against an insurer under G.L.c. 93A, §9 by establishing that the insurer engaged in unfair claim settlement practices under G.L.c. 176D, §3(9). Hopkins v. Liberty Mut. Ins. Co., 434 Mass. at 564-65 (internal citations omitted). The duty of fair dealing in insurance settlement negotiations is set forth under G.L.c. 176D, §3(9). Clegg v. Butler, 424 Mass. at 419. That section provides, in relevant part:
(9) Unfair claim settlement practices: An unfair claim settlement practice shall consist of any of the following acts or omissions:
(f) Failing to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.
*286 G.L.c. 176D, §3(9). "The statutes at issue [G.L.c. 93A and G.L.c. 176D] were enacted to encourage the settlement of insurance claims, and discourage insurers from forcing claimants into unnecessary litigation to obtain relief.” Hopkins, 434 Mass. at 567-68, quoting Clegg, 424 Mass. at 419.
“An absence of good faith and the presence of extortionate tactics generally characterize the basis for a c. 93A-176D action based on unfair settlement practice.” Guity v. Commerce Ins. Co., 36 Mass.App.Ct. 339, 344 (1994), citing Forucci v. United States Fid. & Guar. Co., 817 F.Sup. 195, 202 (D.Mass.), aff'd., 11 F.3d 1 (1st Cir. 1993). “Good faith” for purposes of G.L.c. 93A is defined as “the insurer making settlement decisions without regard to the policy limits and the insurer’s ‘exercise of common prudence to discover the facts as to liability and damages upon which an intelligent decision may be based.’ ” Bolden v. O’Connor Café of Worcester, Inc., 50 Mass.App.Ct. 56, 59 n.9 (2000), quoting Hartford Cas. Ins. Co. v. New Hampshire Ins. Co., 417 Mass. 115, 119 (1994).
Bad faith in the context of an action under G.L.c. 93A may be either objective or subjective. Parker v. D’Avolio, 40 Mass.App.Ct. 394, 396 (1996). “Objective bad faith may be found where a potential defendant offers ‘much less than a case is worth in a situation where liability is either clear or highly likely.’ ” Parker, 40 Mass.App.Ct. at 396, quoting Guity, 36 Mass.App.Ct. at 343. Under the objective bad faith analysis, the key inquiry is whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff. Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass.App.Ct. 955, 956-57 (1995).
Even where an insurer can satisfy the test for obj ective reasonableness, it may still be liable under G.L.c. 93A if the plaintiff can establish that the insurer was motivated by subjective bad faith. Parker, 40 Mass.App.Ct. at 396, citing Hartford Cas. Ins. Co. v. New Hampshire Ins. Co., 417 Mass. 115, 123 (1994); see also DiMarzo v. American Mut. Ins. Co., 389 Mass. at 97; Miller v. Risk Mgmt. Found. of Harvard Med. Insts., Inc., 36 Mass.App.Ct. 411, 419-20 (1994). As the First Circuit Court of Appeals has stated, “(t]he possession of a plausible defense does not automatically preclude a finding of a [G.L.c.] 93A violation; the defense must be clearly articulated and asserted in good faith.” Commercial Union Ins. Co. v. Seven Provinces Ins Co., 217 F.3d 33, 40-41 (1st Cir. 2000), citing Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 56 (1st Cir. 1998).
“If an insurance company has a reasonable and good faith belief that it is not obliged to make a payment to a claimant who is asserting a violation of G.L.c. 93A and G.L.c. 176D, §3(9), asserts the point, and offers to take active steps to resolve the dispute, the company’s action, even if ultimately held to be based on a misinterpretation of the law, would not be an unfair settlement practice.” Premier Ins. Co. of Massachusetts v. Furtado, 428 Mass. 507, 510 (1998).
The LLJUA advances the following arguments in support of its contention that it had plausible grounds for declining to provide coverage for the default judgment: (1) the default judgment entered against the Trust was void, as it was obtained without service of process or the filing of a complaint specifically naming the Trust as a defendant; (2) the LLJUA reasonably relied on the advice provided by its counsel that the policy had been cancelled at Richman’s request prior to the accident at issue in the underlying tort suit; (3) the LLJUA was prejudiced by the Estate’s belated notice of its claim; and (4) the LLJUA was statutorily barred from providing liquor liability coverage once its insured purchased such coverage from the Great American Insurance Company in July 1987. For the following reasons, I find each of the defenses advanced by the LLJUA to be implausible, and that a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff. Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass.App.Ct. at 956-57.
a. The LLJUA could not plausibly rely on the lack of service argument.
The LLJUA’s contention that it acted plausibly by not paying the policy limits after the entry of the default judgment due to lack of service to the Trust is without merit. When the LLJUA responded to the Estate’s G.L.c. 93A demand letter on February 12, 1998 by declining to make an offer of settlement, it already knew that Judge Connon had rejected the LLJUA’s position that the judgment against the Trust was void for lack of service to the Trust. Although Judge Connon did not issue a written memorandum of decision when he denied the LLJUA’s motion to intervene and to set aside the default judgment, the issue of lack of service was one of the grounds set forth by the LLJUA in its post-trial motions. LLJUA thoroughly briefed the issue for the court which found no merit in its claim. Therefore, regardless of what LLJUA thought of the merits of its position, it knew as of December 19, 1996 that the court had rejected this argument. The effect of the court’s ruling was that the Estate had obtained a valid judgment against its insured and LLJUA was bound to accept that ruling unless and until it was vacated by an appellate court.
The fact that the LLJUA appealed Judge Connon’s December 19,1996 ruling, and thatits appeal was still pending at the time it responded to the Estate’s G.L.c. 93A letter, cannot insulate the LLJUA from liabilify under G.L.c. 93A. By not tendering an offer of settlement in response to the Estate’s G.L.c. 93A letter, especially in light of Judge Connon’s ruling affirming the validity of the default judgment, the LLJUA “ran the risk that subsequent events would not support its assertion that its insureds had a reasonable defense.” Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass. at *287 678. This risk came to fruition when the Appeals Court affirmed Judge Connoris denial of the LLJUA’s motion to intervene and to set aside the default judgment on July 27, 2000. Therefore, the LLJUA could not plausibly have relied on the defense of lack of service to the Trust when it declined to tender an offer of settlement in response to the Estate’s G.L.c. 93A demand letter.
An additional reason why the LLJUA’s reliance on the lack of service defense was implausible stems from the fact that the LLJUA had “insureds” that were properly served as of January 1990. The LLJUA policy defined “insured” to include the members and partners of a partnership; the officers, directors, and shareholders of an organization; and employees and agents. The LLJUA’s insureds included Richman and Fortune, as well as the Freedom Tercentennial Trust d/b/a Bert’s Restaurant. Therefore, even though the Freedom Tercentennial Trust was not named as a party to the Silva action in 1990, two of LLJUA’s “insureds,” Richman and Fortun, had been named as defendants and properly served in the Silva action as of January 1990.
It is well settled that a party may waive the defense of insufficiency of service of process. Mass.R.Civ.P. 12(h)(1); Finkel v. Natale Rota, Inc., 19 Mass.App.Ct. 55, 56 (1984). In an analogous context, the Appeals Court has held that a defendant waived the defense of lack of personal jurisdiction when he actively participated in the proceedings by, inter alia, attending two hearings for assessment of damages. Sarin v. Ochsner, 48 Mass.App.Ct. 421, 422-23 (2000). In this case, after Richman was placed on notice that the Court had allowed the Estate’s motion to amend its Complaint to add the Trust as a defendant, it is undisputed that he attended the assessment of damages hearing against the Trust on January 26, 1996.
The LLJUA argues, citing Kveraga-Olson v. Sternberg, Civil No. 96-2085 (Suffolk Super. Ct. June 10, 1997) (Doerfer, J.) (7 Mass. L. Rptr. 49), that the default judgment is void because Richman and Fortun were not served in their capacity as trustees.[22] In that case, however, Judge Doerfer noted that the defendants had no way of knowing that they were required to defend an action in their capacity as trustees of one trust, when they were only served in their capacity as trustees of an entirely different trust. Id. In contrast, Rich-man and Fortun were placed on notice that the Estate was seeking damages from the Trust in October 1993, when the Estate mailed a copy of the Court’s allowance of its motion to amend the Complaint to add the Trust as a defendant. Moreover, Richman and Fortun were notified of the default proceedings against the Trust, as evidenced by the fact that Richman attended the assessment of damages hearing against the Trust on January 26, 1996. Prior to the hearing, the judge met with Smola and Richman in a half-hour lobby conference. The court was told about the parties, the history of the case, the grounds for the default, and that Richman and Fortun were trustees of the Trust. Rich-man was a sophisticated businessperson, and he knew full well the implications of the assessment of damages hearing. In sum, Richman’s knowledge of, and participation in, the default proceedings operated as a waiver of the defense of insufficiency of service of process, and it was therefore implausible for the LLJUA to rely on this defense as a grounds for refusing to tender an offer of settlement in response to the Estate’s G.L.c. 93A demand letter.
Even if the LLJUA did have a plausible defense based on lack of service to the Trust, the LLJUA still violated G.L.c. 93A by raising this defense in a manner tainted by subjective bad faith. Parker v. D’Avolio, 40 Mass.App.Ct. at 396, citing Hartford Cas. Ins. Co. v. New Hampshire Ins. Co., 417 Mass. at 123; see also DiMarzo v. American Mut. Ins. Co., 389 Mass. at 97; Miller v. Risk Mgmt. Found. of Harvard Med. Insts., Inc., 36 Mass.App.Ct. at 419-20. As the First Circuit Court of Appeals has stated, “(t]he possession of a plausible defense does not automatically preclude a finding of a [G.L.c.] 93A. violation; the defense must be clearly articulated and asserted in good faith.” Commercial Union Ins. Co. v. Seven Provinces Ins Co., 217 F.3d 33, 40-41 (1st Cir. 2000), citing Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 56 (1st Cir. 1998).
On September 7, 1993, Smola notified the LLJUA of the Silva action, and he requested that the LLJUA provide coverage on the grounds that the retroactive cancellation of the LLJUA policy was invalid. After Smola noticed the deposition of the LLJUA’s Keeper of Records, Warshowsky sent a letter to Smola objecting to the deposition, stating that “a valid judgment against the insured is a jurisdictional prerequisite to any claim against the LLJUA by plaintiff for payment.” On May 13, 1994, the LLJUA informed Smola that it would not provide coverage for the Estate’s claim, on the grounds that the policy had been canceled, and that the LLJUA had been prejudiced by late notice of the Estate’s claim. At a time when the LLJUA could have assumed the defense of the Silva action under a reservation of rights and raised the defense of insufficiency of service of process prior to the entry of judgment against the Trust, it instead sat on the sidelines for seventeen months and invited the Estate to pursue a judgment against its insured.
When Smola went ahead and obtained the default judgment that Warshowsky told him he needed in order to make a claim on the LLJUA policy, the LLJUA then argued, for the first time, that there was insufficient service of process. This is precisely the type of “shifting defense strategy” that the First Circuit Court of Appeals has held constitutes a violation of G.L.c. 93A. Commercial Union Ins. Co. v. Seven Provinces Ins Co., 217 F.3d at 40-41 (citation omitted). Therefore, even if the LLJUA did have a plausible defense of lack of service, this defense was not asserted in good faith, and accordingly the LLJUA’s conduct amounts to a violation of G.L.c. 93A.
*288 b. The LLJUA could not plausibly rely on the defense that the policy had been cancelled prior to the Silva accident.
The LLJUA argues first that it reasonably relied on the advice of its counsel, P&D, that the Policy had been cancelled prior to the accident at issue in the Silva action. In support of this argument, the LLJUA cites to cases in which an insurer has successfully defended a suit for unfair claims settlement practices by establishing that it reasonably relied on the coverage opinion of outside counsel. See, e.g., Mayer v. Medical Malpractice Joint Underwriting Ass'n, 40 Mass.App.Ct. 266, 274 (1996); Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 15 (1989); Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass. at 677; Behn v. Legion Ins. Co., 173 F.Sup.2d 105, 114 (D.Mass. 2001). For the following reasons, this Court finds that the cases relied upon by the LLJUA are both factually and legally distinguishable from this action, and that the LLJUA’s reliance on P&D’s coverage opinion was unreasonable.
As an initial matter, it should be noted that reliance on the advice of counsel is not absolute proof of good faith, but rather it constitutes “some evidence” of good faith. Hartford Cas. Ins. Co. v. New Hampshire Ins. Co., 417 Mass. at 122 n.5 (1994) (noting that where “an insurance company reasonably relies on the diligent, good faith evaluation of the case, by its counsel, this may be considered as some evidence of good faith" (emphasis added)). Moreover, the “advice of counsel” defense cases relied upon by the LLJUA are factually distinguishable from this case. In the cases in which an insurer was held to have reasonably relied on the advice of counsel, the advice at issue was either from an independent source or, if not, buttressed by independent expert opinion. See. e.g., Mayer v. Medical Malpractice Joint Underwriting Ass’n, 40 Mass.App.Ct. at 274 (counsel’s advice that there was at least a fifty percent chance of a defense verdict was supported by the opinions of three medical experts, all of whom concluded that the insureds had acted in accordance with acceptable medical practices); Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass. at 673-74 (counsel’s advice that there was a reasonable likelihood of success at trial bolstered by medical expert’s opinion that the insured had acted in accordance with accepted medical practice); Behn v. Legion Ins. Co., 173 F.Sup. 2d 105, 114 (D.Mass. 2001) (counsel’s advice that there was a sixty percent chance of a defense verdict supported by, inter alia, independent advice from a psychiatrist that the insured complied with the standard of care of a treating psychiatrist).
First, the advice of counsel on which LLJUA relies was hardly independent. The evidence in this case indicates that P&D has been closely intertwined with the LLJUA since the latter’s inception in 1986. The Massachusetts Division of Insurance recommended that the LLJUA retain P&D as its counsel due, at least in part, to the fact that P&D also represented other legislatively-created underwriting entities, such as the MMPIA and the Massachusetts Property Insurance Underwriting Association. In his role as general counsel for the LLJUA, Schreckinger of P&D has regularly attended meetings of the LLJUA’s Board of Directors and its Claims Committee since 1986. Given this long and close connection, P&D was not- in any sense “independent” counsel.
Nor was there any “independent” vetting of P&D’s advice to LLJUA on the cancellation issue. LLJUA attempts to buttress its “advice of counsel” defense by arguing that an independent attorney advised it that P&D had handled the Silva claim in a proper manner.[23] This “independent” attorney was the same attorney LLJUA retained to prosecute its G.L.c. 93A claim against attorney Smola. This attorney’s connection to the LLJUA and his particular involvement in the handling of the Estate’s claim raises substantial doubt as to the independence of his advice.
LLJUA’s reliance on Boston Symphony Orchestra, supra, does not advance its advice of counsel argument. In that case, the attorney gave advice where there was no applicable precedent with regard to the coverage issue in dispute at the time the insurer denied coverage. The insurer’s interpretation of its policy in those circumstances, although incorrect, was not unreasonable. There is no such ambiguity here. There was a clear unambiguous statute prohibiting retroactive cancellations' and well established precedent in the area of retroactive cancellation which was not favorable to the LLJUA. See G.L.c. 175, §112; see also Benoit v. Fisher, 341 Mass. 386, 388-89 (1960).
Lacking advice from independent counsel, LLJUA’s denial of the Estate’s claim based on the retroactive cancellation was not reasonable in light of all the known facts and circumstances. Early in the investigation of the Estate’s claim, LLJUA’s senior claims representative was skeptical of the validity of the cancellation and remained so all the while that LLJUA was denying the claim on the basis of the retroactive cancellation. He sent the claim file to P&D with this statement: “Please note that the underwriting records indicate that the policy in question was cancelled effective 2-28-87, however, you will note the cancellation date on the declaration page for policy period 12-12-86 to 12-12-87 indicated the policy in question was cancelled on 10-19-87.” And his contemporaneous notes are replete with expressions of concern whether the policy was effectively cancelled prior to the Silva accident.
Consistent with Lunny’s uncertainty regarding the validity of the retroactive cancellation, he repeatedly references a possible reservation of rights letter (“ROR”) or a declaratoiy judgment on the issue of coverage. On February 28, 1994, Lunny writes: Cassandra [Attorney Warshowsky] will do ROR — essentially it will cover late notice, JUA prejudiced, *289 possibility of no coverage. We may file D.J. at a later date." On June 14, 1994, Lunny states “We may file DJ to determine whether we provided coverage on the date of loss.” While an insurer is not obligated to seek a declaratory judgment on the issue of coverage, nor to retain control of the defense of the underlying action under a reservation of rights, in this case had the LLJUA pursued either of these options, its claim that it acted in good faith would have been strengthened. In its motion to set aside the judgment, the LLJUA acknowledged that “where [an] insurer believes, but is not certain, there is no coverage, one proper course of action would be to stay the action against the insured and institute a declaratory judgment action.”
LLJUA was well aware from Lunny’s inquiries and from other information that the cancellation was recorded for the first time in June 1988 retroactive to February 1987 before the Silva accident. In fact, LLJUA had continued to send premium bills to its insured well into 1988. It knew also that there was no documentation of the cancellation request even though the Policy required written notice of cancellation. Despite all that it knew about the questionable circumstances of the retroactive cancellation, LLJUA either wilfully ignored, or simply failed to account for, the applicability of G.L.c. 175, §112, which prohibits the cancellation of a policy of insurance after the insured has become responsible for loss or damage. The confluence of these factors denied any plausibility to LLJUA’s reliance on the cancellation as a defense to the Estate’s claim. In sum, LLJUA’s failure to heed Lunny’s legitimate and pressing concerns and its head in the sand approach to the relevance of G.L.c. 175, §112 demonstrate that its assertion that the Policy was cancelled was hardly a “good faith” defense.
c. The LLJUA could not plausibly rely on the defense of late notice.
Section IV(A)(1) of the LLJUA policy requires the insured to “notify [the LLJUA] promptly as soon as you become aware of any ‘bodily injury[1] which may result in a claim.” Similarly, section IV(A)(3)(a) requires that as a condition to coverage, the insured “must immediately send [the LLJUA] copies of any demands, notices, summonses or legal papers” in connection with any claim or suit. The LLJUA argues that it reasonably believed that coverage would be barred on the Estate’s claim on the grounds that the LLJUA was prejudiced by the Trust’s failure to provide timely notice of the Silva action.
In her June 25, 1999 Memorandum of Decision and Order on the coverage issue, Judge Quinlan relied on well-settled principles of insurance law to support her conclusion that the LLJUA’s “argument fails because it is estopped from [asserting a late notice defense] and it is unable to show prejudice.” Although the issue before this Court is whether the LLJUA plausibly relied on the late notice defense at the time it disclaimed coverage and failed to tender an offer of settlement in response to the Estate’s G.L.c. 93A letter, Judge Quinlan’s reasoning is instructive on this point.
To prevail on a “late notice” defense, the insurer bears the burden of establishing (1) that its insured breached the notice provision of the policy; and (2) that the insurer suffered prejudice as a result of the insured’s breach. Johnson Controls, Inc. v. Bowes, 381 Mass. 278, 282 (1980); Employers’ Liability Assurance Corp., Ltd. v. Hoechst Celanese Corp., 43 Mass.App.Ct. 465, 472 (1997); G.L.c. 175, §112. Relying on the Supreme Judicial Court’s decision in Darcy v. Hartford Ins. Co., 407 Mass. 481, 486-87 (1990), Judge Quinlan concluded that the LLJUA had failed to demonstrate that it suffered any actual prejudice as a result of the delay in notification. In Darcy, the judge’s finding of no actual prejudice to the insurer was upheld where the judge relied primarily on the fact that the insurer learned of the claim against its insured more than two years before the default judgment entered. Darcy, 407 Mass. at 487. The insurer “had sufficient opportunity to investigate the circumstances surrounding the plaintiffs’ injuries” even after the late notice, but the judge characterized the investigative efforts of the insurer as “torpid.” Id.
The facts of this case bear a striking similarity to the facts in Darcy. Smola notified the LLJUA of the Estate’s claim in September 1993, over two years before the default judgment was entered on Februaiy 22, 1996. Moreover, the LLJUA’s investigation into the factual merits of the Silva action was marred by the same sort of “torpidity” present in the insurer’s investigation in Darcy. The LLJUA knew that Great American Insurance Company had assumed the defense of the Silva action under a reservation of rights in early 1990, and that Great American had retained a law firm to pursue this defense. Great American ultimately disclaimed coverage and withdrew its defense in December 1990. It was not until October 1991 that the “no name” storm destroyed records that the LLJUA claims were so crucial to its defense. However, for reasons that were not explained at trial, the LLJUA never contacted Great American or the law firm which had represented Bert’s prior to the “no name” storm, as part of its investigation into the merits of the Silva claim.
The Supreme Judicial Court’s 1990 decision in Darcy, represented the current state of the law as it related to an insurer’s burden of establishing prejudice due to late notice when the LLJUA disclaimed coverage and failed to tender an offer of settlement in response to the Estate’s G.L.c. 93Aletter. Given the similarities between this case and Darcy, it is evident that the LLJUA could not plausibly rely on the defense of late notice.[24]
d. The LLJUA could not plausibly rely on its assertion that it was excused from payment because of the availability of the Great American policy.
The LLJUA’s contention that it plausibly believed that its policy was rendered void by virtue of Bert’s purchase of the Great American policy in July 1987 is *290 untenable for two reasons. First, as Judge Quinlan noted, “Nothing in the [LLJUA’s enabling] statute supports LLJUA’s proposition that should a licensee subsequently obtain coverage from a private insurer, LLJUA’s policy becomes void.” Rather, the enabling statute only requires that a liquor licensee make a reasonable effort to obtain liquor liability coverage from a private insurer prior to applying for an LLJUA policy. St. 1985, c. 223, §5. Apparently satisfied that Bert’s had met this requirement for application, the LLJUA sold Bert’s a liquor liability policy on December 12, 1986. There is absolutely nothing in the LLJUA’s enabling statute to suggest that the subsequent purchase of the Great American policy somehow voided the terms of the LLJUA policy, and thus it was implausible for the LLJUA to rely upon this defense as grounds for refusing to pay the policy limits.
Additionally, the plain language of the various policies at issue in this case further undermines the LLJUA’s contention that the Great American policy voided the terms of the LLJUA policy . In July 1987, Bert’s actually purchased two policies from Great American: a general liability policy, and an excess liability umbrella policy. The general liability policy did not cover liquor liability. The umbrella policy provides: “The insurance provided by this policy shall be excess insurance over any other valid and collectible insurance available to the insured . . .” The LLJUA policy, on the other hand, provides: “This insurance is primacy. Our obligations are not affected unless any other available insurance is also primary. ” Since the Great American umbrella policy provided coverage on an excess basis, and not on a primary basis, it was implausible for the LLJUA to argue that its obligations were affected by the Great American umbrella policy.
C. THE LAWSUIT AGAINST SMOLA
LLJUA filed its lawsuit against Smola claiming that he violated G.L.c. 93A by promising to negotiate a settlement of the Estate’s claim and thereafter securing a default judgment without notice to LLJUA. I begin where the Smola lawsuit ended. LLJUA ultimately dismissed its claims against Smola and paid Smola $5000.00 on his counterclaim for abuse of process. This outcome is powerful testimony that LLJUA filed the lawsuit with full knowledge that it lacked merit and that it did so for reasons other than to assert valid claims against Smola.
As I read the complaint which is part of the record in this case, there was no basis in law or fact for LLJUA’s claim that Smola owed it a duty to forebear in seeking the judgment that LLJUA itself had demanded as a condition to its liability on the Policy. Smola rejected LLJUA’s $3000 settlement offer and communicated this fact to LLJUA. The rejection is documented in the claim file which was available to LLJUA before it filed its suit.[25] In its suit, LLJUA faults Smola for failing to notify it of his actions in the underlying tort action when it must have known that Smola had no obligation to do so. LLJUA had notice of the Estate’s suit against Bert’s at least since 1993. Additionally, LLJUA was well aware of its right to file a declaratory judgment or defend the suit with a reservation of rights, neither of which it elected to do in this case. It was LLJUA’s own action, rather than anything Smola did, which caused the harm LLJUA claimed to have suffered. Taking into account LLJUA’s culpability in the substantial default judgment against its insured when it had notice of the Silva action and an opportunity to intervene, no motive other than one grounded in bad faith is suggested by the filing of this lawsuit against Smola.
In the context of LLJUA’s general approach to the settlement of the Estate’s claim, I conclude that LLJUA’s purpose in filing the Smola lawsuit was to frustrate the Estate’s right to pursue its claim against the Policy and secure a resolution dictated solely by the merits of its claim. I see this purpose in the way LLJUA intertwined its defense of the Estate’s claim and the suit against Smola. Nothing before me suggests that LLJUA ever considered the suit against Smola independently of its defense of the Estate’s claim. The minutes of the September 17, 1997 claim committee meeting[26] at which the Estate’s demand was to be discussed say nothing at all about an appropriate response to the demand. Rather it is at this meeting where LLJUA decided that it would send a G.L.c. 93A claim letter to Smola. Then on October 1, 1997, after receiving information that the Estate had agreed to mediation, Bucke discussed with LLJUA’s “outside” counsel[27] the filing of the lawsuit against Smola. Bucke also contacted Schreckinger who expressed agreement with the suit against Smola. Finally, on October 6, 1997 Bucke noted both a discussion of LLJUA’s suit against Smola and the upcoming mediation with the Estate’s counsel.
The timing of the lawsuit against Smola, just before a scheduled mediation in which all the principal players would be involved, also leads to the inference that LLJUA’s purpose was to shift the battleground away from the merits of the Estate’s claim and LLJUA’s defenses to that claim. The default judgment had entered in February 1996 more than a year before LLJUA sued Smola in October 1997. What happened in the interim is that the Estate in April 1996 sent a G.L.c. 93A demand letter setting forth in some detail its challenge to LLJUA’s refusal to settle on the ground that the Policy had been cancelled. Though it continued to say otherwise, LLJUA must have recognized the force of the Estate’s argument and that ultimately, it would be liable for substantial damages unless the case was settled for short money or abandoned altogether. By refusing to accept the inevitable, LLJUA’s purpose in going forward could only have been to find a way to avoid having to meet the Estate’s demand. The anticipated mediation arranged for November 10, 1997 presented that opportunity. LLJUA, facing intense pressure from the Estate’s new counsel on the *291 viability of LLJUA’s defenses, played its Smola card at the mediation. Though the parties had agreed not to discuss the Smola lawsuit, LLJUA invited its attorney on the Smola lawsuit to attend the mediation. It is difficult to imagine any purpose to be accomplished by his presence except to remind the Estate’s attorneys of the Smola lawsuit and thereby, to create a chilling effect on the Estate’s right to pursue its claim.
I consider the motivation for this lawsuit also in the context of LLJUA’s attitude toward and approach to Smola’s earlier efforts to resolve the Estate’s claim. LLJUA appears to have decided early on to take advantage of Smola’s relative lack of experience, especially in relation to its attorneys who were experts in insurance law. This view of Smola was evident during the September 1994 settlement meeting. Smola went to the meeting aware of the available policy limit and believing, naively perhaps, that LLJUA would make an offer somewhere close to its policy limit. What Smola did not know was that LLJUA had already decided that no coverage existed and it had no intention of making anything more than a nuisance value offer. There was never any intention to negotiate a settlement at this meeting which featured Attorney Schreckinger as the spokesperson for LLJUA and included Bucke and other LLJUA representatives. The goal of the meeting appeared to be to intimidate Smola into settling the Estate’s claim for short money. It was at this meeting that Schreckinger insisted on the superiority of his analysis of the case and offered $3000 in settlement of the Estate’s claim. If, as LLJUA claims, it had no agenda other than communicating its view that the case lacked merit and that it would only offer the $3000, it could just as easily have relayed this offer by telephone through Warshowsky.
Taking these facts into account, the G.L.c. 93A lawsuit against Smola was more of the same, an extortionate hardball tactic that was highly improper under any concept of the rules of fair play. This kind of hardball settlement tactic that seeks to knock out an opponent on grounds other than the merits of the dispute fits well within the test for bad faith bargaining. See Heller, 367 Mass. at 627 (bad faith bargaining is a violation of G.L.c. 93A); see also Ellis v. Safety Insurance Co., 41 Mass.App.Ct. 630, 640 (1996) (“racial harassment perpetrated during the course of an insurance claim investigation may well constitute an unfair business practice”); Hochen v. Bobst Group, Inc., 198 F.R.D. 11 (2000) (plaintiffs motion to add insurer as a party for the purpose of coercing larger settlement offer proper subject for Rule 11 sanctions).
LLJUA argues that no improper motive should be attributed to it because Smola was no longer counsel to the Estate when the suit was filed. However, the fact is that Smola was still representing the Estate at the time the suit was brought and LLJUA was aware of Smola’s continued involvement in the case, though in a subordinate role to the Estate’s lead counsel.
D. THE ESTATE’S DAMAGES UNDER G.L.c. 93A
When a plaintiff prevails in an action brought under G.L.c. 93A, the court awards damages in accordance with G.L.c. 93A, §9(3), which provides in relevant part as follows:
[R]ecovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two.
The provision allowing multiple damages for “willful and knowing” conduct is “directed against callous and intentional violations of the law.” Heller v. Silverbranch Construction Corp., 376 Mass. 621, 627 (1978) (citation omitted). The authority for multiple damages based on “bad faith” is an “attempt to promote prelitigation settlements by making it unprofitable for the defendant to either ignore the plaintiffs request for relief or to bargain with the plaintiff with respect to such relief in bad faith.” Id. at 627. If LLJUA’s conduct was neither willful or knowing nor in bad faith, the Estate is entitled to no more than its actual damages. G.L.c. 93A, §9(3). Conversely, if LLJUA’s conduct was either willful or knowing or in bad faith, the Estate is entitled to an award of multiple damages. For the reasons explained below, I conclude that LLJUA acted in bad faith in refusing to tender the policy limit toward the default judgment against its insured and that the Estate is entitled to an award of multiple damages.
Having in mind that “only in the rare and exceptionally egregious case,” Parker v. D’Avolio, 40 Mass. App. at 402, will a finding of bad faith be justified, the facts as I have found them demonstrate LLJUA’s bad faith. Bad faith is “not simply bad judgment. It is not merely negligence. It imports a dishonest purpose or some moral obliquity. It implies a conscious doing of wrong. It means a breach of a known duty through some motive of interest or ill will.” Id. at 402-03 (citation omitted). LLJUA’s conduct in response to the Estate’s demand for payment of its insured’s policy limit toward the default judgment in the underlying action meets this test. Of course LLJUA had the right, in resisting the Estate’s demands, to assert reasonable defenses to its liability. However, LLJUA stepped beyond the boundaries of good faith when it (a) persisted in its denial of the Estate’s claim by knowingly asserting meritless defenses to the Estate’s claim, and (b) engaged in the unconscionable tactic of bringing a frivolous G.L.c. 93A lawsuit against Smola to impede the Estate’s right to pursue the default judgment against LLJUA’s insured.
As discussed above, the filing of the lawsuit against Smola, as part of a deliberate strategy to subvert the *292 Estate’s pursuit of its claim, establishes LLJUA’s bad faith. In addition, LLJUA’s failure to settle with the Estate when its liability was reasonably clear violated G.L.c. 176D, §3(9)(f) and by extension, G. L c. 93A. Given the facts and law as outlined above, LLJUA’s violation of G.L.c. 176D, §3(9)(f) is “persuasive evidence” that LLJUA’s conduct was willful, knowing and in bad faith. See R.W. Granger & Sons, Inc., v. J&S Insulation, Inc., 435 Mass. 66, 78 (2001) (citation omitted). Nonetheless, I discuss briefly additional considerations in support my ruling that LLJUA’s conduct was tainted by bad faith.
LLJUA was well aware of the tenuous nature of the legal arguments it advanced to justify its refusal to settle the Estate’s claim. Yet, this knowledge did not deter LLJUA in resisting the Estate’s demand for settlement of its claim. The circumstances surrounding the retroactive cancellation of the Policy in June 1988 and the relevant law governing that practice together unmistakably signaled that the validity of the cancellation was not defensible. The Policy as issued was effective from December 1986 to December 1987. The Silva accident occurred on September 12, 1987, within the effective period of the Policy. LLJUA can-celled the Policy on June 17, 1988 retroactive to February 1987, well before the Silva accident. As LLJUA well knew, retroactive cancellations are expressly prohibited by G.L.c. 175, §112. Nonetheless, it chose to ignore the plain meaning of G.L.c. 175, §112, offering instead an interpretation that totally defeated the purpose of the statute.
Even if it was possible to interpret the statute so as to confirm LLJUA’s retroactive cancellation of the Policy, this was not a case where such an action would be appropriate. Up until June 1988, LLJUA had acted as if the Policy was in effect, sending periodic payment de.-mands to the insured. After being contacted by Richman who claimed that he had made an oral request to cancel the Policy in January 1987, LLJUA amended its records to reflect the cancellation as that date. There was nothing in LLJUA’s files to document a request for cancellation in January 1987 such that the June 1988 cancellation might be taken as the ratification of an earlier unrecorded act. And assuming that the “cancellation” could be fairly characterized as an accommodation to its customer, prudence and compliance with the clear intent of the law required that LLJUA nullify its action after presentment of the Estate’s claim based on an act occurring with the coverage period. Against this backdrop, I conclude that LLJUA relied on the purported cancellation of the Policy with full knowledge that its action could not pass muster under the law.
Similarly, LLJUA knew that it was on perilously thin ice in relying on late notice as a basis for refusing the Estate’s demand for settlement of its claim. As discussed above, LLJUA did not plausibly rely on the late notice defense because it received notice of the underlying tort suit in September 1993 well before the default judgment entered in February 1996 and purposely chose to do nothing to assert its rights under the Policy. At the time LLJUA asserted this defense against the Estate’s claim, the law governing this issue was well settled. See Darcy v. Hartford Ins. Co., 407 Mass. at 487. When an insurer relies on a position that finds no support in the law, it cannot claim to do so in good faith.
LLJUA also had to know that the lack of service argument was not one on which it could plausibly rely. At least as of the date of its response on February 12, 1998 to the Estate’s demand letter, LLJUA was aware that this defense already had been rejected by the court. And there was no need for a further judicial order. See Clegg v. Butler, 424 Mass. at 418. Unless LLJUA could claim with certainty, which it could not, that its position would be favored on appeal, its persistence in relying on this defense was not in good faith.
The “other coverage” argument was obviously without merit as well. The issue whether LLJUA would be excused from liability under the Policy because of the Great American policy was not even close. It is undisputed that the Great American policy did not cover liquor liability and that it was an excess policy. This was not a situation where one might have different but reasonable interpretations of LLJUA’s obligation under the Policy. The reliance on this defense was another example of LLJUA’s bad faith refusal to accept the merits of the Estate’s claim.
The only remaining issue is the determination of the “actual damages” to be multiplied in accordance with the statute. I am guided in resolving this issue by Cohen v. Liberty Mutual Ins. Co., 41 Mass.App.Ct. 748 (1996), which interpreted the provision in G.L.c. 93A, §9(3) defining the “actual damages” to be multiplied.[28] The relevant language provides that:
For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim.
The court looked to the genesis of this language which was added by an amendment to G.L.c. 93A, §9(3). This amendment was enacted by the Legislature in response to the court’s decision in Wallace v. American Mfrs. Mut. Ins. Co., 22 Mass.App.Ct. 938 (1986). The court in Wallace had limited the damages that could be multiplied to the interest accruing on the claim from the date of the insurer’s failure to settle to the date of the judgment. Id. at 939-40. After considering a literal interpretation that would encompass “ ‘all claims’ regardless of a causal connection to a [G.L.]c. 93A violation, id. at 753, the court concluded that the Legislature intended to accomplish a much narrower purpose. Because the Legislature intended only to change the rule that had limited the multiplication factor to accrued interest only, the court held that "the causal connection between the defendant’s wrongdoing and the resulting damages is still a part of [the G.L.]c. 93A *293 calculus." See R.W. Granger & Sons, Inc. v. J&S Insulation, Inc., 434 Mass. at 80-81. Therefore, “actual damages” are those losses which are the “foreseeable consequences of LLJUA’s unfair or deceptive conduct after its liability became reasonably clear. Cohen at 755.
The Estate’s argument that the underlying default judgment represents the actual damages on which the calculation of multiple damages must be based cannot be reconciled with the court’s holding in Cohen.[29] The requirement that a plaintiff show a causal connection between the damages and the wrongful conduct necessarily excludes the default judgment in the underlying tort action as the basis for the award of multiple damages. Here the wrongful conduct alleged by the Estate in its G.L.c. 93A claim occurred after the default judgment in the underlying suit. The requisite causal connection between LLJUA’s wrongful conduct and the Estate’s damages can be established only by reference to the reach and apply judgment. The loss here is obviously the Estate’s right to the use of those funds it would have received if LLJUA had timely paid the policy limit toward the underlying tort judgment. In the circumstances of this case, LLJUA’s liability became reasonably clear after the presentment of the Estate’s demand on April 22, 1996. Therefore, the actual damages on which the multiple is to be based is the policy limit plus interest running from May 22, 1996, thirty days after the Estate’s demand. See Hopkins v. Liberty Mutual Ins. Co., 434 Mass. at 560. Since the Estate has received the policy limit in satisfaction of its reach and apply claim, that amount will be deducted from the total award to avoid a double recovery. See Calimlim v. Foreign Car Ctr. Inc., 393 Mass. 228 (1984) (no right to recovery under G.L.c. 93A and under a breach of warranty theory for the same harm). In consideration of the nature and impact of LLJUA’s bad faith conduct, I conclude that an award of double damages as calculated in Exhibit B is sufficient to achieve the legislative purpose in the statute.
ORDER
For the reasons stated above, I enter the following orders:
1) Damages on the Estate’s reach and apply claim are assessed in the amount of $2,911,141.83.
2) Judgment shall enter for the Estate on its claim pursuant to G.L.c. 93A. Damages are awarded to the Estate on this claim in the amount of $1,324,201.20. Counsel for the Estate is ordered to file an appropriately documented petition for the award of attorneys fees and costs.
EXHIBIT A
The postjudgment interest is to be calculated as follows:
DEDUCTION FOR GREAT AMERICAN SETTLEMENT:
30 Total Judgment 3,687,644.70[30]
[2/26/96]
Interest Rate 12.00%
Interest Per day 1,212.38
[Judgment x Interest Rate/365 Days]
Judgment Date 2/22/96
Total Interest Due 709,242.30
as of 9/30/97 [Dally Interest x 585 days
(2/26/96-9/30/97)]
Less Great American 750,000.00
Settlement
APPLICATION OF GREAT AMERICAN SETTLEMENT TO POSTJUDGMENT INTEREST:
Total Postjudgment Interest 709,242.30
Settlement Payment 750,000.00
UNPAID PORTION OF JUDGMENT AS OF 9/30/97:
Judgment 3,687,644.70
Remainder of Settlement -40,757.70
Unpaid Judgment 3,646, 887.00 as of 9/30/97
POSTJUDGMENT INTEREST ACCRUED
THROUGH 4/4/03:
Interest Per Day 1,198.98
[Judgment x Interest
Rate/365 Days]
Interest Due 10/1/97-4/04/03 2,411,141.83
[Daily Interest x 2011 days
(10/1/97-4/04/03)]
Plus Policy Limit 500,000.00
TOTAL DUE TO ESTATE $2,941,141.83
EXHIBIT B
Policy Limit 500,000.00
Interest Rate 12%
Daily Interest 164.38
[Policy Limit x Interest Rate/Days Per Year]
Interest Accrual Date May 22, 1996
Total Days Interest 2507 Days
[5/22/96-4/04/03]
Total Interest 412,100.60
[2507 days x 164.38]
Base c. 93A Damages 912,201.20
[Policy limit plus interest]
Total c. 93A Damages 1.824.201.20
[Base Damages x2]
Less Policy Limit Already 500,000.00
Paid In Reach and Apply
Adjusted G.L.c. 93A Damages 1.324.201.20

 will refer to this entity as the “Trust” or “Bert’s.”

This action, originally filed in the Bristol Superior Court, was transferred to Suffolk County and consolidated with LLJUA’s declaratory judgment action.

Bucke testified at trial that he was not familiar with G.L.c. 175, § 112 at the time coverage was being discussed. However, I do not credit that testimony. Bucke had worked for over thirty years in the insurance industry, and he had substantial experience in the area of claims management. He was also well versed in the operations of the LLJUA.

This point is underscored by the LLJUA’s proposed finding of fact #236, wherein it states: “There Is no evidence that the LLJUA would have done anything differently had it learned that Smola was pursuing a default judgment against the Trust.” LLJUA’s proposed finding goes on: “Shreckinger and Bucke previously had discussed whether the LLJUA should enter an appearance on behalf of the Trust in the Silva action. Schreckinger advised Bucke that the LLJUA could not appear on behalf of the Trust, because the Trust had not been *294 asked to defend it.” It is therefore evident that the LLJUA would have done nothing differently had it known that Smola was seeking a judgment against LLJUA’s insured.

Although R/F Enterprises had previously filed for bankruptcy, its bankruptcy proceeding was closed in April 1991 without a discharge, so judgment could be entered against R/F Enterprises without violation of the automatic stay or a discharge in bankruptcy.

The Estate previously received $10,000 from McGowan’s insurer and $100,000 from Silva’s underinsured motorist coverage.

See e.g. the following formulation as set forth in DiMarzo v. American Mutual Ins. Co., 389 Mass. 85, 112 (1983), citing Lunt v. Aetna Life Ins. Co., 261 Mass. 469, 473 (1928), quoting from Boston & Albany R.R. v. Reardon, 226 Mass. 286, 291 (1917): “In order to work an estoppel it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done and which has resulted to his harm and that the other knew or had reasonable cause to know that such consequence might follow.” The elements are essentially the same.

See Palermo v. Fireman's Fund Insurance Co., 42 Mass.App.Ct. 283, 291, citing Morse v. Employers' Liab. Assur. Corp., 3 Mass.App.Ct. 712 (1975) (plaintiff in a reach and apply action derivatively stands in the shoes of the policyholder).

The Policy provides that: ‘We shall have the right and duty to defend any suit against the insured seeking . . . ‘damages’ even if the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as we deem expedient.” See also Camp, Dresser & McKee, Inc., v. The Home Ins. Co., 30 Mass.App.Ct. 318 (1991) (“In order to give rise to the duty to defend, the underlying complaint need only show a possibility of coverage”). Id. at 322.

See discussion infra.

The Estate received $100,000 from Silva’s underinsured motorist coverage; $10,000 from McGowan’s motor vehicle insurer; and $750,000 from Great American Insurance Company.

G.L.c. 93A, §2.

G.L.c. 176D, §2.

The version of G.L.c. 176D, §2(a) at issue in Poznik provided that “[n]o person shall engage in this commonwealth in any trade practice which is defined in this chapter as . . . an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.” A “person” subject to the statute was “any individual, corporation, association, partnership . . . and any other legal entity or self-insurer which is engaged in the business of insurance, including agents, brokers, and adjusters.” G.L.c. 176D, §1 (1992 ed.). Statutorily established joint underwriting associations were not specifically included in the 1992 version of G.L.c. 176D.

When a claim brought under G.L.c. 93A, §9 is based on a violation of G.L.c. 176D, §3(9), the court is not obligated to separately analyze whether the challenged conduct occurred in “trade or commerce” as required by G.L.c. 93A, §2. The requirement in G.L.c. 176D that a defendant be engaged in the “business of insurance” is the analog to G.L.c. 93A’s “trade or commerce” provision.

In this regard, I follow and adopt the analysis of this court in Bolden v. LLJUA, supra, which on a similar factual record concluded that LLJUA is in the “business of insurance.”

LLJUA cites St. 1985, c.223, §6 in support of its requested finding that it must either return any surplus to its policyholders or hold it as reserves to cover future liabilities. I see no such reference in the statute.

In the context of G.L.c. 93A, the “use of the term ‘profit’ ... is meant colloquially, in the sense of revenues that exceed expenses.” Linkage Corp., 425 Mass. at 25, n.35.

The surplus represents the cash available to LLJUA over and above the amount retained as reserve.

According to audited financial statements, LLJUA’s surplus for the past ten years was as follows: 1990-$3,498,069; 1991-$960,207; 1992-$860,498; 1993-$2,849,367; 1994-$3,282,954; 1995-$8,445,978; 1996-$12,692,974; 1997-$19,261,750; 1998-$23,006,744; 1999-$29,052,989; 2000-$30,042,220.

Altliough LLJUA accumulated profits through 2001, I take particular note of the years between 1996 and 1998, the relevant time period for the pendency of the Estate’s claim against the Policy.

Again, it is worth noting that Judge Connon rejected this position when he denied the LLJUA’s motion to intervene and to set aside the default judgment on December 19, 1996.

It is not clear that the statement attributed to the “independent” attorney related to P&D’s advice on the cancellation issue. Given LLJUA’s predicament facing the substantial default judgment against its insured after having ignored the claim, it is equally plausible that this comment related to any role P&D may have had in LLJUA’s decision not to defend the Silva action under a reservation of rights or seek a declaratory judgment.

An additional factor weighing against the plausibility of the late notice defense is the fact that the LLJUA itself was the cause of the delay in notice. It was the LLJUA’s decision to retroactively cancel the LLJUA policy in 1988 that induced Bert’s to fail to notify LLJUA of the Silva action in 1990. Therefore, as Judge Quinlan concluded, the LLJUA would be estopped from asserting a late notice defense. See DiMarzo v. American Mutual Ins. Co., 389 Mass. at 112.

Smola’s rejection of the $3000 offer is documented in the claim file notes of Dave Lunny. Lunny was not called as a witness at the trial and I draw the inference that his testimony would have been unfavorable to LLJUA. “When the circumstances of a case are such that a party would be expected to call a witness who is available to testify but the witness is not called, the [finder of fact] may be permitted to infer that the witness’s testimony would have been adverse to that party.” Corsetti v. Stone Co., 396 Mass. 1, 15-16 (1985) (internal citations omitted).

The August 28, 1997 minutes of the claim committee indicate that the Estate had made a demand between $245,000 and $800,000 and that the demand would be presénted to the claim committee on September 17, 1997.

LLJUA hired a law firm other than P&D to represent it in the G.L.c. 93A lawsuit against Smola.

In the underlying tort action, ajury awarded the plaintiff $90,000. After ajury waived trial on the G.L.c. 93A claim, the trial judge awarded the plaintiff “actual damages” amounting to the insurer’s policy limit of $20,000 together with interest from the date the insurer’s liability became reasonably clear. Finding the insurer’s refusal to settle to be knowing, the judge trebled those damages . The plaintiff appealed, arguing that the judge should have trebled the $90,000 award in the underlying tort action. The court affirmed the damages calculation.

The Estate seeks an award of treble damages in the amount of $19,385,210.40 based on its calculation of the present value of the default judgment.

This underlying judgment is $3,687,644.70 which includes: damages ($2,112,081.00); prejudgment interest ($1,575,453.70); and costs ($110.00).